## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **M.M., individually, as the father of JOHN DOE 1, and as the legal representative of the ESTATE OF JOHN DOE 1,** | ) ) ) |
| | ) |
| **HA., the mother of JOHN DOE 1,** | ) |
| | ) |
| **A.M., the brother of JOHN DOE 1,** | ) |
| | ) |
| **A.Z., the brother of JOHN DOE 1,** | ) |
| | ) |
| **MA., the minor brother of JOHN DOE 1, by and through his parent and natural guardian, M.M.,** | ) ) |
| | ) |
| **MU., the sister of JOHN DOE 1,** | ) |
| | ) |
| **ZU., the sister of JOHN DOE 1,** | )   **Case No. _____** |
| | ) |
| **A.F., individually, as the brother of JOHN DOE 2, and as the legal representative of the ESTATE OF JOHN DOE 2,** | ) ) ) |
| | ) |
| **R.S., the widow of JOHN DOE 2,** | )   **JURY TRIAL DEMANDED** |
| | ) |
| **M.H.M., the minor son of JOHN DOE 2, by and through his parent and natural guardian, R.S.,** | ) ) |
| | ) |
| **M.Y., the father of JOHN DOE 2,** | ) |
| | ) |
| **NA., the mother of JOHN DOE 2,** | ) |
| | ) |
| **A.FD., the brother of JOHN DOE 2,** | ) |
| | ) |
| **M.A., the brother of JOHN DOE 2,** | ) |
| | ) |
| **DI., the sister of JOHN DOE 2,** | ) |
| | ) |
| **R.K., the legal representative of the ESTATE OF JOHN DOE 3,** | ) ) |
| | ) |
| **MZ., the widow of JOHN DOE 3,** | ) |
| | ) |
| **MB., the minor son of JOHN DOE 3, by and through his parent and natural guardian, MZ.,** | ) ) |

BE., the minor daughter of JOHN DOE 3, by and through her parent and natural guardian, MZ.,   )
)
)
)

M.B., the father of JOHN DOE 3,   )
)

B.S., the mother of JOHN DOE 3,   )
)

G.B., the brother of JOHN DOE 3,   )
)

ZA., individually, as the widow of JOHN DOE 4, and as the legal representative of the ESTATE OF JOHN DOE 4,   )
)
)
)

DU., the minor daughter of JOHN DOE 4, by and through her parent and natural guardian, ZA.,   )
)
)

NE., the minor daughter of JOHN DOE 4, by and through her parent and natural guardian, ZA.,   )
)
)

A.G., the mother of JOHN DOE 4,   )
)

SE., the brother of JOHN DOE 4,   )
)

QU., the brother of JOHN DOE 4,   )
)

SH., the brother of JOHN DOE 4,   )
)

SA., the brother of JOHN DOE 4,   )
)

NS., the sister of JOHN DOE 4,   )
)

SO., individually, as the widow of JOHN DOE 5, and as the legal representative of the ESTATE OF JOHN DOE 5,   )
)
)
)

NM., the minor son of JOHN DOE 5, by and through his parent and natural guardian, SO.,   )
)
)

PA., the minor daughter of JOHN DOE 5, by and through her parent and natural guardian, SO.,   )
)
)

ES., the brother of JOHN DOE 5,   )
)

G.G., individually, as the widow of JOHN DOE 6,   )

2

**and as the legal representative of the ESTATE OF**
**JOHN DOE 6,**

**SK., the daughter of JOHN DOE 6,**

**TA., the son of JOHN DOE 6,**

**SM., the son of JOHN DOE 6,**

**RA., the son of JOHN DOE 6,**

**FA., the daughter of JOHN DOE 6,**

**MT., the minor son of JOHN DOE 6, by and**
**through his parent and natural guardian, G.G.,**

**OM., the minor son of JOHN DOE 6, by and**
**through his parent and natural guardian, G.G.,**

**B.B., the mother of JOHN DOE 6,**

**B.Z., the sister of JOHN DOE 6,**

**HK., the sister of JOHN DOE 6,**

**N.E., individually, as the widow of JOHN DOE 7,**
**and as the legal representative of the ESTATE OF**
**JOHN DOE 7,**

**S.E., the daughter of JOHN DOE 7,**

**E.E., the minor son of JOHN DOE 7, by and**
**through his parent and natural guardian, N.E.,**

**SA.E., the minor daughter of JOHN DOE 7, by and**
**through her parent and natural guardian, N.E.,**

**M.Q.G., individually, as the father of JOHN DOE 8,**
**and as the legal representative of the ESTATE OF**
**JOHN DOE 8,**

**F.G., the mother of JOHN DOE 8,**

**B.G., the minor brother of JOHN DOE 8, by and**
**through his parent and natural guardian, M.Q.G.,**

**M.G., the minor sister of JOHN DOE 8, by and**
**through her parent and natural guardian, M.Q.G.,**

**T.G., the minor sister of JOHN DOE 8, by and**
**through her parent and natural guardian, M.Q.G.,**

**and**

**M.O.G., the minor brother of JOHN DOE 8, by and**
**through his parent and natural guardian, M.Q.G.,**

**Plaintiffs,**

**v.**

**ISLAMIC REPUBLIC OF IRAN**

**Serve:**      **Foreign Minister Mohammed Zarif**
              **Ministry of Foreign Affairs**
              **Khomeini Avenue**
              **United Nations Street**
              **Tehran, Iran**

**Defendant.**

## COMPLAINT

NOW COME the Plaintiffs, comprised of eight deceased victims of the Zanbaq Square bombing in Kabul, Afghanistan on May 31, 2017 ("Zanbaq Square Attack") and their immediate families (collectively referred to herein as "Plaintiffs"), by counsel, and for their Complaint against Defendant, the Islamic Republic of Iran ("Iran"), state as follows:

## I.      THE PARTIES

1.      John Doe 1 was killed in the Zanbaq Square Attack. M.M. is the legal representative of the Estate of John Doe 1.

2.      M.M. is the father of John Doe 1.

3.      Ha. is the mother of John Doe 1.

4.      A.M. is the brother of John Doe 1.

5.      A.Z. is the brother of John Doe 1.

6.      Ma. is the brother of John Doe 1.

7.      Mu. is the sister of John Doe 1.

8.      Zu. is the sister of John Doe 1.

9.      John Doe 2 was killed in the Zanbaq Square Attack. A.F. is the legal

representative of the Estate of John Doe 2.

10.     A.F. is the brother of John Doe 2.

11.     R.S. is the widow of John Doe 2.

12.     M.H.M. is the son of John Doe 2.

13.     M.Y. is the father of John Doe 2.

14.     Na. is the mother of John Doe 2.

15.     A.Fd. is the brother of John Doe 2.

16.     M.A. is the brother of John Doe 2.

17.     Di. is the sister of John Doe 2.

18.     John Doe 3 was killed in the Zanbaq Square Attack. R.K. is the legal

representative of the Estate of John Doe 3.

19.     Mz. is the widow of John Doe 3.

20.     Mb. is the son of John Doe 3.

21.     Be. is the daughter of John Doe 3.

22.     M.B. is the father of John Doe 3.

23.     B.S. is the mother of John Doe 3.

24.     G.B. is the brother of John Doe 3.

25.     John Doe 4 was killed in the Zanbaq Square Attack. Za. is the legal representative of the Estate of John Doe 4.

26.     Za. is the widow of John Doe 4.

27.     Du. is the daughter of John Doe 4.

28.     Ne. is the daughter of John Doe 4.

29.     A.G. is the mother of John Doe 4.

30.     Se. is the brother of John Doe 4.

31.     Qu. is the brother of John Doe 4.

32.     Sh. is the brother of John Doe 4.

33.     Sa. is the brother of John Doe 4.

34.     Ns. is the sister of John Doe 4.

35.     John Doe 5 was killed in the Zanbaq Square Attack. So. is the legal representative of the Estate of John Doe 5.

36.     So. is the widow of John Doe 5.

37.     Nm. is the son of John Doe 5.

38.     Pa. is the daughter of John Doe 5.

39.     Es. is the brother of John Doe 5.

40.     John Doe 6 was killed in the Zanbaq Square Attack. G.G. is the legal representative of the Estate of John Doe 6.

41.     G.G. is the widow of John Doe 6.

42.     Sk. is the daughter of John Doe 6.

43.     Ta. is the son of John Doe 6.

44.     Sm. is the son of John Doe 6.

45.     Ra. is the son of John Doe 6.

46.     Fa. is the daughter of John Doe 6.

47.     Mt. is the son of John Doe 6.

48.     Om. is the son of John Doe 6.

49.     B.B. is the mother of John Doe 6.

50.     B.Z. is the sister of John Doe 6.

51.     Hk. is the sister of John Doe 6.

52.     John Doe 7 was killed in the Zanbaq Square Attack. N.E. is the legal

representative of the Estate of John Doe 7.

53.     N.E. is the widow of John Doe 7.

54.     S.E. is the daughter of John Doe 7.

55.     E.E. is the son of John Doe 7.

56.     Sa.E. is the daughter of John Doe 7.

57.     John Doe 8 was killed in the Zanbaq Square Attack. M.Q.G. is the legal

representative of the Estate of John Doe 8.

58.     M.Q.G. is the father of John Doe 8.

59.     F.G. is the mother of John Doe 8.

60.     B.G. is the brother of John Doe 8.

61.     M.G. is the sister of John Doe 8.

62.     T.G. is the sister of John Doe 8.

63.     M.O.G. is the brother of John Doe 8.

64.     Defendant, Iran, is a foreign state. Since January 19, 1984, Iran has been

designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export

Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

## II.   JURISDICTION AND VENUE

65.   Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), 1367, and 1605A.

66.   Despite its status as a foreign state, Iran is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due to its longstanding designation as a "State Sponsor of Terrorism."

67.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

68.   At the time of the Zanbaq Square Attack, John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7, and John Doe 8 (the "Attack Victims") were each employed by a company performing a contract awarded by the United States Government and acting within the course and scope of their duties under that contract.

## III.   NATURE OF THE ACTION

69.   On May 31, 2017, at 8:25am local time, a truck containing over three thousand pounds of explosives was detonated on a busy intersection, known as Zanbaq Square, in the heavily secured diplomatic quarter of Kabul, Afghanistan. Nearby buildings included the German, French, Turkish, and British embassies, as well as buildings used as offices for American personnel and contractors. The explosion killed at least 150 people and injured over 400. The Attack Victims were among those killed.

70.   The Zanbaq Square Attack was part of a broader conspiracy between the Taliban, the Haqqani Network, and Iran to attack American interests and allies in Afghanistan with violent acts of terrorism.

71.     Iran has long served as a co-conspirator with the Taliban. It leverages that relationship to advance its goal of expanding its influence in Afghanistan by fostering political instability and pressuring American leaders to withdraw military forces.

72.     To carry out the Zanbaq Square Attack, Taliban and/or Haqqani Network operatives needed financial support, training in the use of explosives, and explosive materials. Iran has consistently provided the Taliban and the Haqqani Network with each of these types of support, even to the point of paying bounties for successful attacks.

73.     The type and size of the explosives used in the Zanbaq Square Attack, the location of the attack, the timing of the attack, and the sophisticated nature of the attack, all point to Iran's involvement. Such an attack could have been impossible for the Taliban and/or Haqqani Network to carry out apart from Iranian assistance and support.

74.     By knowingly and intentionally providing material support and resources to enable and assist the Taliban and/or the Haqqani Network in carrying out acts of terrorism, Iran is liable for the damages suffered by Plaintiffs as a direct and proximate result of the Zanbaq Square Attack.

## IV.     FACTUAL ALLEGATIONS

### A.     <u>Iran's Substantial and Pervasive Support for International Terrorism</u>

75.     Since the Iranian revolution in 1979, Iran has engaged in and supported terrorist organizations and acts of terrorism as an instrument of its foreign policy.

76.     Iran's widespread support for terrorist groups such as Hezbollah, Hamas, and the Taliban is well-documented. As a result, the State Department has formally designated Iran as a state sponsor of terrorism at all times since its initial designation in 1984.

77.     Iran carries out its support of terrorism, in large part, through the Islamic Revolutionary Guard Corps ("IRGC"), which is a military force parallel to the regular Iranian military. The IRGC is supervised by the Iranian Parliament but operates as an agent and instrumentality of the Supreme Leader of Iran, Ayatollah Ali Hoseini Khamenei. The Supreme Leader serves as commander and chief of the armed forces, appoints the head of each military service, declares war and peace, appoints the head of the judiciary, and may dismiss the elected president of Iran at any time.

78.     The IRGC also has a constitutional role as the defender of the Islamic Revolution and owns or controls hundreds of companies, particularly those in the oil and gas, engineering, telecommunications, and infrastructure sectors. The IRGC holds billions of dollars in military business and other government contracts.

79.     On April 15, 2019, the State Department formally designated the IRGC as a Foreign Terrorist Organization.

80.     The IRGC has a special foreign division, known as the Quds Force ("IRGC-QF"), which is the branch of the IRGC primarily used to promote and support terrorism abroad. The IRGC-QF has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing. It is one of the most organized, disciplined, and deadly organizations in the world.

81.     The IRGC-QF prioritizes funding and training for terrorism operations targeting American citizens, including support for terrorist organizations like Hezbollah, al Qaeda, and the Taliban. These activities are known and sanctioned by Iran's Supreme Leader and are an official platform of Iran's foreign policy.

82.     Accordingly, pursuant to Executive Order 13224, the Treasury Department has designated the IRGC-QF as a "terrorist organization" and the State Department has designated the IRGC-QF as a "foreign terrorist organization."

83.     Iran also supports terrorism through its Ministry of Information and Security ("MOIS"), which is an intelligence agency with an annual budget of between $100 million and $400 million. Like the IRGC-QF, MOIS has been involved in kidnappings, assassinations, and other acts of terrorism since its inception.

**B.     The Taliban**

84.     The Taliban is a Sunni Islamic organization that was founded in 1994 by a man known as Mullah Mohammed Omar for the purpose of imposing Sharia law throughout Afghanistan. The Taliban was largely successful in this effort, effectively ruling Afghanistan from 1996 until 2001.

85.      Following the September 11, 2001 terrorist attacks, the United States demanded that the Taliban surrender Osama bin Laden. The Taliban refused, leading to an American-led invasion of Afghanistan with the purpose of toppling the Taliban regime.

86.     The invasion was initially successful at expelling the Taliban from political control over Afghanistan. A transitional government ratified a Constitution in December 2003 without assistance or participation from the Taliban.

87.     The Taliban responded by setting up what became known as "shadow" governments in various local and regional areas throughout Afghanistan, allowing it to maintain a substantial level of influence and control.

88.     Since the 2001 invasion, the Taliban's singular focus has been to expel foreign forces from Afghanistan and to regain its authority over the country. The primary means of

achieving that goal has been the planning, support, and execution of terrorist attacks against American personnel and interests.

89.     The Taliban was formally named a Specially Designated Global Terrorist ("SDGT") on July 2, 2002.

90.     Despite ongoing counter-insurgency efforts, the Taliban's violent attacks and shadow political efforts have been quite effective, allowing them to regain and maintain some semblance of control and authority within substantial portions of Afghanistan.

**C.     The Haqqani Network**

91.      The Haqqani Network is a Sunni Islamic terrorist organization that was founded in Afghanistan in the 1970s.

92.     Today, the Haqqani Network is effectively an extension and alter-ego of the Taliban.

93.     Between 2008 and 2011, the United States Department of State designated four members of the Haqqani family as SDGTs.

94.     On September 19, 2012, the State Department designated the Haqqani Network as a Foreign Terrorist Organization pursuant to section 219 of the Immigration and Nationality Act.

95.     Then, in February 2014, the State Department designated an additional fourteen Haqqani Network leaders as SDGTs.

96.     The relationship between the Haqqani Network and the Taliban began as a mutually beneficial partnership shortly after the Taliban was formed, with the Haqqani Network supplying weapons for Taliban fighters.

97.     When the Taliban succeeded in seizing control over Afghanistan, the Haqqani Network and its leaders swore allegiance to the Taliban. In exchange, the Taliban appointed

Jalaluddin Haqqani, the group's founder, as the Minister of Tribal and Border Affairs for the new government. Jalaluddin Haqqani served in this role until the fall of the Taliban regime in 2001.

98.     With the success of the American-led invasion of Afghanistan, the Taliban and the Haqqani Network were permanently united in their objectives to repel the foreign forces and regain their territory and authority.

99.     Shortly after the invasion, a Jihadist internet publication described Jalaluddin Haqqani as the "chief of the Taliban army."

100.     Jalaluddin's son, Sirajuddin Haqqani, inherited his father's leadership of the Haqqani Network and his prominent role within the Taliban. The chief spokesman for the United States and NATO forces in Afghanistan stated that, as of 2016, Sirajuddin Haqqani "increasingly runs the day-to-day military operations for the Taliban and, we believe, is likely involved in appointing shadow governors."

101.     In 2016, a senior Taliban commander was quoted as saying that Sirajuddin Haqqani was in "constant contact" with Taliban military commanders throughout Afghanistan and that all field commanders were required to confirm their fighting plans with him.

102.     Taliban spokesmen and key Haqqani Network leaders have both confirmed that the Haqqani Network operates in concert with the Taliban.

### D.     Iran's Influence in Afghanistan

103.     Although the Iranian regime belongs to the Shia sect of Islam and the Taliban and the Haqqani Network are Sunni organizations, those religious differences do not and have not kept them from conspiring together in terrorist activities.

104.     Iran first provided limited support to Sunni Afghan groups during the Soviet-Afghan War, where its primary goal was to resist the expansion of communist and Western

influence in the region. Its support to these groups in the fight against Russian forces was often conditioned on the adoption of anti-American positions and Iran condemned any reliance on Western-supplied weapons during the conflict.

105.    Ayatollah Khomeini was Iran's Supreme Leader until his death in 1989. He publicly stated that Iran should welcome all Afghans, including Sunnis, particularly because of their common enemies.

106.    Historically, however, the relationship between Iran and the Taliban was also a contentious and violent one. Following the withdrawal of Soviet troops in 1989, Afghanistan was engulfed in civil war for much of the 1990s. On one side of that conflict were Shia militias, whom Iran actively supported with the hope of establishing a friendly Shia government on its eastern border. But when the Taliban had secured control over most of Afghanistan by 1996, they largely eradicated the Shia forces.

107.    Tensions between Iran and the Taliban peaked in August 1998 when the Taliban captured the city of Mazar-I Sharif in northwestern Afghanistan. After capturing the city, the Taliban targeted ethnic Shia individuals for execution. Among those killed were eight Iranian consulate officials and an Iranian journalist, whom the Taliban later claimed had been operating as intelligence officers.

108.    This tense dynamic between Iran and the Taliban dramatically shifted after September 11, 2001 and the subsequent invasion of Afghanistan by the United States. For the first time since the Soviet-Afghan War, the two sides once again shared common ground in their animosity toward the United States and its allies.

109.    In fact, the groundwork for this shift had begun forming prior to the 9/11 attacks. In January 2001, a Taliban delegation met with senior Iranian officials to discuss various military

14

and political matters. One such topic was "Iran's purported desire to see the Taliban join the Northern Alliance in order to defend Afghanistan" in the event of a possible American invasion. *See Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 36 (D.D.C. 2011).

110.    As early as October 2001, members of the IRGC were already meeting with the Taliban to offer them military support and resources. Iran instigated this meeting, which was held on the Iranian side of the border with Afghanistan. *Id.* at 37.

111.    As part of this initial offer of support, Iran pledged to sell advanced military equipment to the Taliban for use against Americans, bragged of their ability to track US military forces, and promised "to open their border to Arabs entering Afghanistan." Iran also "offered to broker a peace between the Taliban and the Northern Alliance so Muslims could unite against the United States." *Id.* at 38.

112.    Shortly before American-led air strikes began in 2001, Iran sent a high-ranking official to offer sanctuary to Taliban leaders. Those who travelled to Iran were allowed to move freely across the Iran-Afghanistan border to recruit fighters and inflict damage on Afghan and Coalition interests. The IRGC offered these same Taliban forces cash rewards for the killing of Afghan officials or American soldiers.

113.    In February 2002, then Director of Central Intelligence, George J. Tenet, testified before Congress that "initial signs of Tehran's cooperation and common cause with us in Afghanistan are being eclipsed by Iranian efforts to undermine US influence there. While Iran's officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on countering the US presence."

114.    In March 2007, a shipment of Iranian-made weapons bound for the Taliban was captured by American forces inside Afghanistan. This shipment included mortars and plastic

explosives bearing markings indicating that they were manufactured in Iran. In reference to this development, Assistant Secretary of State Richard Boucher stated that there were "a series of indicators that Iran is maybe getting more involved in an unhealthy way in Afghanistan."

115.    In January 2009, the official spokesman for the Pentagon stated that the United States had observed Iranian support, such as the provision of explosively formed penetrators, in Afghanistan.

116.    On August 30, 2009, U.S. Army General Stanley McChrystal, the commander of American forces in Afghanistan, referred to Iran's role in Afghanistan at that time as "ambiguous." While Iran publicly appeared to support the development of the new government in Kabul, the IRGC-QF was training Taliban fighters "and providing other forms of military assistance to insurgents." He noted that "Iran has the capability to threaten the mission in the future."

117.    In December 2009, intelligence officials from the United Arab Emirates reported to the Treasury Department that Iran was supporting the Taliban financially, providing them weapons, helping the Taliban to smuggle narcotics, and facilitating the movement of Taliban members. It was specifically noted that the IRGC and the Iranian Navy were involved in the provision of these various forms of material support to the Taliban.

118.    In March 2010, a Taliban commander said of Iran, "our religions and our histories are different, but our target is the same – we both want to kill Americans."

119.    In May 2010, Gen. McChrystal publicly announced that Iran was providing material support to the Taliban. He explained "[t]he training that we have seen occurs inside Iran with fighters moving inside Iran" and that there is "clear evidence of Iranian activity, in some cases of providing weapons and training to the Taliban that is inappropriate."

120.     On August 3, 2010, the United States Department of the Treasury designated General Hossein Musavi and Colonel Hasan Mortezavi for their roles in supporting the Taliban. General Musavi was the leader of the Ansar Corps, the branch of the IRGC-QF responsible for carrying out activities within Afghanistan. Colonel Mortezavi is a senior officer in the IRGC-QF. The Treasury Department found that both General Musavi and Colonel Mortezavi, acting in their official roles, had provided "financial and material support to the Taliban." In that same report, the Treasury Department concluded that "the IRGC-QF provides select members of the Taliban with weapons, funding, logistics and training."

121.     On February 5, 2011, British troops intercepted a weapons shipment of rockets to the Taliban. British foreign secretary William Hague said that "detailed technical analysis, together with the circumstances of the seizure, leave us in no doubt that the weaponry recovered came from Iran."

122.     On March 7, 2012, the Treasury Department designated IRGC-QF General Gholamreza Baghbani as a Specially Designated Narcotics Trafficker. General Baghbani, acting in his official role as a senior IRGC-QF officer, facilitated a drug smuggling ring that involved the shipment of opium from Afghanistan into Iran in exchange for weapons. The drug smugglers working on behalf of General Baghbani would deliver weapons directly to the Taliban.

123.     In April 2012, the Department of Defense provided Congress with its Annual Report on Military Power of Iran and stated that the "active sponsorship of terrorist and insurgent groups, such as Lebanese Hizballah, Iraqi Shia groups, and the Taliban, are tools Iran uses to increase its regional power." The Report further explained that even though Iranian "support to the Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many groups to maximize its influence while also undermining U.S. and [NATO]

objectives by fomenting violence." By means of "the IRGC-QF, Iran provides material support to terrorist or militant groups such as . . . the Taliban."

124.     That same year, the United States Department of State concluded that "the IRGC-QF trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets." The State Department further stated that arms transfers to the Taliban from Iran, including plastic explosives, had been going on since 2006.

125.     By July 2012, Iran had allowed the Taliban to open an office in Zahedan, Iran.

126.     On February 6, 2014, the Treasury Department designated two more IRGC-QF officers, Alireza Hemmati and Akbar Seyed Alhosseini, for their role in "supporting terrorism in Afghanistan and funneling Iranian assistance to the Taliban." This support included the provision of "logistical assistance" to an associate responsible for planning and executing terrorist attacks.

127.     Early in 2014, Iran allowed the Taliban to open an office in Mashhad, Iran.

128.     On May 27, 2014, President Obama announced that American combat operations in Afghanistan would end by December 2014 and that troop levels would be significantly reduced by that time. In light of this troop withdrawal, Iran greatly accelerated its support for the Taliban in 2014 and 2015.

129.     In June 2015, a Taliban commander stated that "Iran supplies us with whatever we need." This same commander explained how he had been detained in Iran as an illegal laborer but was offered double his prior salary by the IRGC if he "went to work for them in Afghanistan." At that time, the IRGC was operating at least four Taliban training camps within Iran and was increasing its transportation of weapons and explosives into Afghanistan.

130.    The emergence of a wing of the Islamic State ("ISIS") in Afghanistan in 2015 deepened Iran's desire to support the Taliban as a partner in the Iranian regime's ongoing battle against ISIS.

131.    On May 21, 2016, then Taliban leader Mullah Akhtar Mohammed Mansour was killed by a drone strike at the Iran-Pakistan border. The Taliban's chief spokesman, Zabihullah Mujahid, subsequently stated that Mullah Mansour had been visiting Iran to fulfill "ongoing battle obligations."

132.    Later in 2016, three IRGC-QF officers were killed in an American air strike against Taliban positions in the Farah province of Afghanistan.

133.    In June 2017, the United States Department of Defense published its semi-annual report to Congress entitled "Enhancing Security and Stability in Afghanistan." Therein, it was noted that "Iran's desire for influence in Afghanistan remains strong and is not expected to wane."

134.    The same report confirmed the relationship between the Taliban and the Haqqani Network within the time period of the Zanbaq Square Attack:

> The externally enabled Haqqani Network remains the greatest threat to Afghan, U.S., and coalition forces. Haqqani Network leader Sirajuddin Haqqani's role as a Taliban deputy has solidified Haqqani influence within the Taliban. Sirajuddin Haqqani's position has likely allowed the Haqqani Network to increase its area of operations within Afghanistan and provided the Taliban with additional operational and planning capabilities. Haqqani and Taliban integration has become so robust that many observers no longer look at them as separate entities, but as factions within the same group.

135.    Beyond direct military training and supplies, Iran has long served as a financial lifeline for the Taliban through its involvement in and enabling of the Taliban's illegal drug trafficking. Narcotics are the Taliban's greatest source of income. Iran assists in this financing by

allowing its border with Afghanistan to be crossed by the Taliban and enlisting members of the IRGC in the transport and sale of large quantities of illicit drugs.

136.    On October 23, 2018, the Treasury Department announced the designation of eight individuals as a result of an international effort to curb Iran's illicit support for the Taliban. Among these individuals were:

- Mohammad Ebrahim Owhadi, an IRGC-QF officer that reached an agreement in 2017 with a Taliban governor to ensure Iranian support for the Taliban in the Herat Province of Afghanistan. In 2016, he participated in plans to establish a compound in Iran that would house injured Taliban fighters and the families of those fighters that had been hurt or killed. In 2014, Owhadi was personally involved with distributing arms to Afghanistan on behalf of the IRGC-QF.

- Esma'il Razavi, who acted "for or on behalf of IRGC-QF and for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the Taliban." He personally encouraged and ordered the Taliban to carry out terrorist acts.

- Abdullah Samad Faroqui, the Taliban governor who conspired with Owhadi to further the training and support relationship between the Taliban and Iran. In early 2018, he personally received thousands of kilograms of explosives from the IRGC for distribution to Taliban commanders. He met with Iranian intelligence officials as early as 2006 to facilitate the supply of money and military equipment to the Taliban.

137.    In November 2018, the United States Government announced its recovery of an Iranian-made drone in Afghanistan that had been launched from Iran and used to surveil Afghan and American military installations. At the same time, the United States also revealed Iranian-made rockets that were recovered directly from Taliban forces.

138.    In January 2019, the Secretary of Iran's Supreme National Security Council stated publicly that Iran was providing military support to the Taliban.

139.    Iran's support for the Taliban is ongoing and accelerating. Taliban and Haqqani Network fighters continue to receive advanced military and tactical training from Iran in large

numbers. Much of the training takes place inside of Iran, facilitated by the freedom of movement that Iran allows for Taliban fighters across its border. In exchange for this support, Iran demands that the Taliban focus on particular targets, specifically including American personnel.

140.    Iran has also directly encouraged the Taliban and the Haqqani Network to attack American personnel, interests, and allies by offering and paying bounties for certain attacks.

141.    The Haqqani Network brokered meetings between local Taliban military leadership and IRGC-QF officers. The purpose of those meetings was to offer money and training for attacks against Americans with financial bonuses promised for successful attacks.

142.    As one specific example, United States intelligence reports recently confirmed that Iran paid the Haqqani Network to attack Bagram Air Base in December 2019.

### C.    The Zanbaq Square Attack

143.    Zanbaq Square is the name of an intersection in the diplomatic zone of Kabul, Afghanistan, located just outside of the heavily fortified "Green Zone" and in close proximity to many foreign embassies.

144.    At 8:25 a.m. local time on May 31, 2017, Zanbaq Square was filled with its normally high volume of morning rush hour traffic.

145.    At that same time and place, a large truck containing over three thousand pounds of explosives entered Zanbaq Square.

146.    The explosives were hidden in a large tanker truck used to clean out septic systems.

147.    Upon information and belief, the Taliban and/or the Haqqani Network planned and authorized this attack with the intent of detonating the explosives near buildings used by

American diplomatic personnel and other diplomatic facilities for other foreign nations. The path of the truck in the moments prior to its detonation confirms this intent.

148.     However, before the suicide truck reached its intended target, it attracted the attention of various security personnel. The driver then diverted from his original route and detonated the explosives in Zanbaq Square.

149.     The blast resulted in damage at the embassies of China, Turkey, France, India, and Japan. Other embassies close by included the United States, Britain, and Pakistan.

150.     The massive explosion left a thirty-foot-deep crater in the roadway, destroyed more than fifty cars, killed at least 150 people, and injured over 400.

151.     The Attack Victims were killed in the blast.

152.     At the time of their death, the Attack Victims were working as employees under contracts with the United States Government and acting within the scope of their employment pursuant to those contracts.

## V.     CAUSES OF ACTION

### COUNT I – PROVISION OF MATERIAL SUPPORT FOR
### THE EXTRAJUDICIAL KILLING OF JOHN DOE 1 (28 U.S.C. § 1605A(c))

153.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

154.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

155.     Iran provided material support and resources to the Taliban and the Haqqani Network for the purpose of supporting, enabling, advancing, and benefitting from their terrorist activities, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

156.    As such, Iran's provision of material support and resources to the Taliban and the Haqqani Network was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as John Doe 1, is an expected and welcomed result of those actions.

157.    Such conduct violates 28 U.S.C. § 1605A.

158.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

159.    The Zanbaq Square Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death.

160.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 1 was killed in the Zanbaq Square Attack.

161.    At the time of the Zanbaq Square Attack, John Doe 1 was employed by a company performing a contract awarded by the United States Government and acting within the scope of his duties under that contract

162.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban and the Haqqani Network, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT II – PROVISION OF MATERIAL SUPPORT FOR
### THE EXTRAJUDICIAL KILLING OF JOHN DOE 2 (28 U.S.C. § 1605A(c))

163.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

164.   At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

165.   Iran provided material support and resources to the Taliban and the Haqqani Network for the purpose of supporting, enabling, advancing, and benefitting from their terrorist activities, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

166.   As such, Iran's provision of material support and resources to the Taliban and the Haqqani Network was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as John Doe 2, is an expected and welcomed result of those actions.

167.   Such conduct violates 28 U.S.C. § 1605A.

168.   A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

169.   The Zanbaq Square Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death.

170.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 2 was killed in the Zanbaq Square Attack.

171.   At the time of the Zanbaq Square Attack, John Doe 2 was employed by a company performing a contract awarded by the United States Government and acting within the scope of his duties under that contract

172.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban and the Haqqani Network, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT III – PROVISION OF MATERIAL SUPPORT FOR
## THE EXTRAJUDICIAL KILLING OF JOHN DOE 3 (28 U.S.C. § 1605A(c))

173.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

174.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

175.     Iran provided material support and resources to the Taliban and the Haqqani Network for the purpose of supporting, enabling, advancing, and benefitting from their terrorist activities, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

176.     As such, Iran's provision of material support and resources to the Taliban and the Haqqani Network was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as John Doe 3, is an expected and welcomed result of those actions.

177.     Such conduct violates 28 U.S.C. § 1605A.

178.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

179.     The Zanbaq Square Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death.

180.      As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 3 was killed in the Zanbaq Square Attack.

181.     At the time of the Zanbaq Square Attack, John Doe 3 was employed by a company performing a contract awarded by the United States Government and acting within the scope of his duties under that contract

182.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban and the Haqqani Network, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT IV – PROVISION OF MATERIAL SUPPORT FOR
### THE EXTRAJUDICIAL KILLING OF JOHN DOE 4 (28 U.S.C. § 1605A(c))

183.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

184.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

185.     Iran provided material support and resources to the Taliban and the Haqqani Network for the purpose of supporting, enabling, advancing, and benefitting from their terrorist activities, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

186.     As such, Iran's provision of material support and resources to the Taliban and the Haqqani Network was and is intentional, wanton, and willful, with the explicit understanding

that violence against American contractors, such as John Doe 4, is an expected and welcomed result of those actions.

187.    Such conduct violates 28 U.S.C. § 1605A.

188.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

189.    The Zanbaq Square Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death.

190.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 4 was killed in the Zanbaq Square Attack.

191.    At the time of the Zanbaq Square Attack, John Doe 4 was employed by a company performing a contract awarded by the United States Government and acting within the scope of his duties under that contract

192.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban and the Haqqani Network, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT V – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING OF JOHN DOE 5 (28 U.S.C. § 1605A(c))

193.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

194.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

195.     Iran provided material support and resources to the Taliban and the Haqqani Network for the purpose of supporting, enabling, advancing, and benefitting from their terrorist activities, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

196.     As such, Iran's provision of material support and resources to the Taliban and the Haqqani Network was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as John Doe 5, is an expected and welcomed result of those actions.

197.     Such conduct violates 28 U.S.C. § 1605A.

198.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

199.     The Zanbaq Square Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death.

200.      As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 5 was killed in the Zanbaq Square Attack.

201.     At the time of the Zanbaq Square Attack, John Doe 5 was employed by a company performing a contract awarded by the United States Government and acting within the scope of his duties under that contract.

202.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban and the Haqqani Network, is criminal, outrageous,

extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT VI – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING OF JOHN DOE 6 (28 U.S.C. § 1605A(c))

203.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

204.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

205.    Iran provided material support and resources to the Taliban and the Haqqani Network for the purpose of supporting, enabling, advancing, and benefitting from their terrorist activities, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

206.    As such, Iran's provision of material support and resources to the Taliban and the Haqqani Network was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as John Doe 6, is an expected and welcomed result of those actions.

207.    Such conduct violates 28 U.S.C. § 1605A.

208.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

209.    The Zanbaq Square Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death.

210.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 6 was killed in the Zanbaq Square Attack.

211.    At the time of the Zanbaq Square Attack, John Doe 6 was employed by a company performing a contract awarded by the United States Government and acting within the scope of his duties under that contract

212.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban and the Haqqani Network, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT VII – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING OF JOHN DOE 7 (28 U.S.C. § 1605A(c))

213.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

214.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

215.    Iran provided material support and resources to the Taliban and the Haqqani Network for the purpose of supporting, enabling, advancing, and benefitting from their terrorist activities, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

216.    As such, Iran's provision of material support and resources to the Taliban and the Haqqani Network was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as John Doe 7, is an expected and welcomed result of those actions.

217.    Such conduct violates 28 U.S.C. § 1605A.

218. A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

219. The Zanbaq Square Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death.

220. As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 7 was killed in the Zanbaq Square Attack.

221. At the time of the Zanbaq Square Attack, John Doe 7 was employed by a company performing a contract awarded by the United States Government and acting within the scope of his duties under that contract

222. Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban and the Haqqani Network, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT VIII – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING OF JOHN DOE 8 (28 U.S.C. § 1605A(c))

223. Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

224. At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

225. Iran provided material support and resources to the Taliban and the Haqqani Network for the purpose of supporting, enabling, advancing, and benefitting from their terrorist

activities, including through the fomenting of general unrest in Afghanistan and the commission

of attacks against United States personnel and interests.

226.    As such, Iran's provision of material support and resources to the Taliban and the

Haqqani Network was and is intentional, wanton, and willful, with the explicit understanding

that violence against American contractors, such as John Doe 8, is an expected and welcomed

result of those actions.

227.    Such conduct violates 28 U.S.C. § 1605A.

228.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations

of that section leading to injuries that "may include economic damages, solatium, pain and

suffering, and punitive damages."

229.    The Zanbaq Square Attack was an unauthorized, illegal, and deliberate use of

physical force resulting in substantial human casualties, executed with the attempt to bring about

injuries and/or death.

230.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts,

John Doe 8 was killed in the Zanbaq Square Attack.

231.    At the time of the Zanbaq Square Attack, John Doe 8 was employed by a

company performing a contract awarded by the United States Government and acting within the

scope of his duties under that contract

232.    Iran's continuing provision of material support to those willing to commit murder,

and other terrorist acts, such as the Taliban and the Haqqani Network, is criminal, outrageous,

extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive

damages.

## COUNT IX – COMMON LAW
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

233.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

234.    The Taliban and/or the Haqqani Network's act of terrorism against the Attack Victims was intentional, reckless, extreme, and outrageous, and caused Plaintiffs to experience severe emotional distress.

235.    The Zanbaq Square Attack violated acceptable norms of humane treatment under the laws of the United States and the acceptable norms of international law by which all civilized nations transact their affairs.

236.    The Zanbaq Square Attack was extreme and outrageous, perpetrated with the intent to intimidate and coerce.

237.    Iran, through its influence and direction of the Taliban and the Haqqani Network, knowingly and willfully provided material support, training, and direction to the Zanbaq Square Attack, with the express purpose of causing severe injury and death to the victims of the attack and intimidating others.

238.    M.M., Ha., A.M., A.Z., Ma., Mu., Zu., A.F., R.S., M.H.M., M.Y., Na., A.Fd., M.A., Di., Mz., Mb., Be., M.B., B.S., G.B., Za., Du., Ne., A.G., Se., Qu., Sh., Sa., Ns., So., Nm., Pa., Es., G.G., Sk., Ta., Sm., Ra., Fa., Mt., Om., B.B., B.Z., Hk., N.E., S.E., E.E., Sa.E., M.Q.G., F.G., B.G., M.G., T.G., and M.O.G. (collectively the "Family Member Plaintiffs") are the immediate family members of the Attack Victims.

239.    Iran knew, or reasonably should have known, that terrorist acts would cause severe emotional distress to the victims of the terrorist attacks it sponsors and to the family

members of those victims. The Family Member Plaintiffs were foreseeable victims of the attack
for which Iran provided direction, training, and material support.

240.    Therefore, Iran is responsible for the damages suffered by the Family Member
Plaintiffs as a direct and proximate result of the Zanbaq Square Attack.

241.    Because Iran acted in a willful and wanton manner, showing a conscious
disregard for the rights of others, the Family Member Plaintiffs request an award of punitive
damages.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award damages to Plaintiffs
against Iran on all Counts, and grant Plaintiffs:

For Counts I and IX, the following:

    a.   Damages for pain and suffering experienced by John Doe 1 in the amount of
$10,000,000, or a sum certain to be determined at trial, to the Estate of John
Doe 1;

    b.   Economic losses suffered by the Estate of John Doe 1 in the amount of
$5,000,000, or a sum certain to be determined at trial;

    c.   Damages for solatium and intentional infliction of emotional distress in a total
amount of $22,500,000, comprised of the following sums:

        -   $5,000,000 on behalf of M.M., father of John Doe 1;
        -   $5,000,000 on behalf of Ha., mother of John Doe 1;
        -   $2,500,000 on behalf of A.M., brother of John Doe 1;
        -   $2,500,000 on behalf of A.Z., brother of John Doe 1;
        -   $2,500,000 on behalf of Ma., brother of John Doe 1;
        -   $2,500,000 on behalf of Mu., sister of John Doe 1;
        -   $2,500,000 on behalf of Zu., sister of John Doe 1;

    d.   Punitive damages in the amount of $150,000,000, allocated proportionately
with the compensatory judgments awarded to this family;

    e.   Interest, from May 31, 2017 until the date of judgment; and

     f.   Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Counts II and IX, the following:

     a.   Damages for pain and suffering experienced by John Doe 2 in the amount of $10,000,000, or a sum certain to be determined at trial, to the Estate of John Doe 2;

     b.   Economic losses suffered by the Estate of John Doe 2 in the amount of $5,000,000, or a sum certain to be determined at trial;

     c.   Damages for solatium and intentional infliction of emotional distress in a total amount of $33,000,000, comprised of the following sums:

> - $8,000,000 on behalf of R.S., widow of John Doe 2;
> - $5,000,000 on behalf of M.H.M., son of John Doe 2;
> - $5,000,000 on behalf of M.Y., father of John Doe 2;
> - $5,000,000 on behalf of Na., mother of John Doe 2;
> - $2,500,000 on behalf of A.Fd., brother of John Doe 2;
> - $2,500,000 on behalf of M.A., brother of John Doe 2;
> - $2,500,000 on behalf of A.F., brother of John Doe 2;
> - $2,500,000 on behalf of Di., sister of John Doe 2;

     d.   Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to this family;

     e.   Interest, from May 31, 2017 until the date of judgment; and

     f.   Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Counts III and IX, the following:

     a.   Damages for pain and suffering experienced by John Doe 3 in the amount of $10,000,000, or a sum certain to be determined at trial, to the Estate of John Doe 3;

     b.   Economic losses suffered by the Estate of John Doe 3 in the amount of $5,000,000, or a sum certain to be determined at trial;

     c.   Damages for solatium and intentional infliction of emotional distress in a total amount of $30,500,000, comprised of the following sums:

> - $8,000,000 on behalf of Mz., widow of John Doe 3;
> - $5,000,000 on behalf of Mb., son of John Doe 3;

- $5,000,000 on behalf of Be., daughter of John Doe 3;
- $5,000,000 on behalf of M.B., father of John Doe 3;
- $5,000,000 on behalf of B.S., mother of John Doe 3;
- $2,500,000 on behalf of G.B., brother of John Doe 3;

d. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to this family;

e. Interest, from May 31, 2017 until the date of judgment; and

f. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Counts IV and IX, the following:

a. Damages for pain and suffering experienced by John Doe 4 in the amount of $10,000,000, or a sum certain to be determined at trial, to the Estate of John Doe 4;

b. Economic losses suffered by the Estate of John Doe 4 in the amount of $5,000,000, or a sum certain to be determined at trial;

c. Damages for solatium and intentional infliction of emotional distress in a total amount of $35,500,000, comprised of the following sums:

- $8,000,000 on behalf of Za., widow of John Doe 4;
- $5,000,000 on behalf of Du., daughter of John Doe 4;
- $5,000,000 on behalf of Ne., daughter of John Doe 4;
- $5,000,000 on behalf of A.G., mother of John Doe 4;
- $2,500,000 on behalf of Se., brother of John Doe 4;
- $2,500,000 on behalf of Qu., brother of John Doe 4;
- $2,500,000 on behalf of Sh., brother of John Doe 4;
- $2,500,000 on behalf of Sa., brother of John Doe 4;
- $2,500,000 on behalf of Ns., sister of John Doe 4;

d. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to this family;

e. Interest, from May 31, 2017 until the date of judgment; and

f. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Counts V and IX, the following:

    a.  Damages for pain and suffering experienced by John Doe 5 in the amount of $10,000,000, or a sum certain to be determined at trial, to the Estate of John Doe 5;

    b.  Economic losses suffered by the Estate of John Doe 5 in the amount of $5,000,000, or a sum certain to be determined at trial;

    c.  Damages for solatium and intentional infliction of emotional distress in a total amount of $20,500,000, comprised of the following sums:

- $8,000,000 on behalf of So., widow of John Doe 5;
- $5,000,000 on behalf of Nm., son of John Doe 5;
- $5,000,000 on behalf of Pa., daughter of John Doe 5;
- $2,500,000 on behalf of Es., brother of John Doe 5;

    d.  Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to this family;

    e.  Interest, from May 31, 2017 until the date of judgment; and

    f.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Counts VI and IX, the following:

    a.  Damages for pain and suffering experienced by John Doe 6 in the amount of $10,000,000, or a sum certain to be determined at trial, to the Estate of John Doe 6;

    b.  Economic losses suffered by the Estate of John Doe 6 in the amount of $5,000,000, or a sum certain to be determined at trial;

    c.  Damages for solatium and intentional infliction of emotional distress in a total amount of $53,000,000, comprised of the following sums:

- $8,000,000 on behalf of G.G., widow of John Doe 6;
- $5,000,000 on behalf of Sk., daughter of John Doe 6;
- $5,000,000 on behalf of Ta., son of John Doe 6;
- $5,000,000 on behalf of Sm., son of John Doe 6;
- $5,000,000 on behalf of Ra., son of John Doe 6;
- $5,000,000 on behalf of Fa., daughter of John Doe 6;
- $5,000,000 on behalf of Mt., son of John Doe 6;
- $5,000,000 on behalf of Om., son of John Doe 6;
- $5,000,000 on behalf of B.B., mother of John Doe 6;

-   $2,500,000 on behalf of B.Z., sister of John Doe 6;
-   $2,500,000 on behalf of Hk., sister of John Doe 6;

d.  Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to this family;

e.  Interest, from May 31, 2017 until the date of judgment; and

f.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Counts VII and IX, the following:

a.  Damages for pain and suffering experienced by John Doe 7 in the amount of $10,000,000, or a sum certain to be determined at trial, to the Estate of John Doe 7;

b.  Economic losses suffered by the Estate of John Doe 7 in the amount of $5,000,000, or a sum certain to be determined at trial;

c.  Damages for solatium and intentional infliction of emotional distress in a total amount of $23,000,000, comprised of the following sums:

-   $8,000,000 on behalf of N.E., widow of John Doe 7;
-   $5,000,000 on behalf of S.E., daughter of John Doe 7;
-   $5,000,000 on behalf of E.E., son of John Doe 7;
-   $5,000,000 on behalf of Sa.E., daughter of John Doe 7;

d.  Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to this family;

e.  Interest, from May 31, 2017 until the date of judgment; and

f.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Counts VIII and IX, the following:

a.  Damages for pain and suffering experienced by John Doe 8 in the amount of $10,000,000, or a sum certain to be determined at trial, to the Estate of John Doe 8;

b.  Economic losses suffered by the Estate of John Doe 8 in the amount of $5,000,000, or a sum certain to be determined at trial;

   c. Damages for solatium and intentional infliction of emotional distress in a total amount of $20,000,000, comprised of the following sums:

- - $5,000,000 on behalf of M.Q.G., father of John Doe 8;
- - $5,000,000 on behalf of F.G., mother of John Doe 8;
- - $2,500,000 on behalf of B.G., brother of John Doe 8;
- - $2,500,000 on behalf of M.G., sister of John Doe 8;
- - $2,500,000 on behalf of T.G., sister of John Doe 8;
- - $2,500,000 on behalf of M.O.G., brother of John Doe 8;

   d. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to this family;

   e. Interest, from May 31, 2017 until the date of judgment; and

   f. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Dated: October 5, 2021               Respectfully submitted,

                                _____/s/ Kevin A. Hoffman_____
                                Randy D. Singer (DCD Bar No. VA057)
                                Kevin A. Hoffman (DC Bar No. 1044559)
                                SINGER DAVIS, LLC
                                1209A Laskin Road
                                Virginia Beach, VA 23451
                                Phone: (757) 301-9995
                                Fax: (757) 233-1084
                                Email: randy.singer@singerdavis.law
                                Email: kevin.hoffman@singerdavis.law
                                *Counsel for Plaintiffs*