**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **M.M.**, individually, as the father of JOHN DOE 1, and as the legal representative of the ESTATE OF JOHN DOE 1, *et al.*,<br><br>               Plaintiffs,<br><br>          v.<br><br>**ISLAMIC REPUBLIC OF IRAN**,<br><br>              Defendant. | Case No. 1:21-cv-2783 (TNM) |

<u>**MEMORANDUM OPINION**</u>

In 2017, terrorists detonated a bomb near the U.S. Embassy in Afghanistan. The blast killed nearly a hundred people, including eight Afghan security contractors employed by the United States (collectively, the Contractors). The Contractors' estates and relatives (collectively, Plaintiffs) blame the Islamic Republic of Iran. In their view, Iran knowingly and willfully supported, trained, and directed the Taliban and the Haqqani Network—two well-known terrorist organizations—to carry out the attack. So Plaintiffs sued Iran for materially supporting extrajudicial killings in violation of the Foreign Sovereign Immunities Act (FSIA).

Iran ignored this case, and Plaintiffs now move for default judgment and damages. Plaintiffs have successfully shown that Iran lacks sovereign immunity under the FSIA's terrorism exception. They have proven the Court has personal jurisdiction over Iran. And they have established their entitlement to a favorable judgment, although they are not all entitled to the full damages they seek. So the Court will partially grant Plaintiffs' Motion for Default Judgment and award them damages as allowed by law.

## I.  INTRODUCTION

This case concerns a 2017 terrorist attack in Kabul.  Plaintiffs, the estates and relatives of U.S. contractors killed in that bombing, claim Iran provided material support to the responsible terrorist groups.  *See* Pls.' Mot. for Default J. (Default Mem.) at 2,[1] ECF No. 27-1.  Because of that support, Plaintiffs say, Iran should be held liable.

Under the FSIA, foreign states are generally immune from suit in the United States.  *See Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  But "that grant of immunity is subject to a number of exceptions."  *Id.*  Plaintiffs say the "terrorism exception" applies here.  Default Mem. at 12.  Under that exception, victims may sue foreign states that provide material support for extrajudicial killings carried out by terrorist organizations.  *See* 28 U.S.C. § 1605A.

Iran never responded.  So Plaintiffs moved for default judgment.  *See generally* Default Mem.  To prevail on that motion, Plaintiffs must prove that the Court has both subject matter and personal jurisdiction over Iran.  *See Jerez v. Repub. of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014).  And they must also "establish[] [their] claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).

Plaintiffs primarily rely on two expert reports.  *See* Exp. Rep. of Phillip Smyth (Smyth Rep.), ECF No. 27-3; Exp. Rep. of Abbie Aryan (Aryan Rep.), ECF No. 27-4.  This is common in FSIA cases because "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign."  *Owens v. Repub. of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Repub. of Sudan*, 140 S. Ct. 1601 (2020).  The Court has reviewed these experts' credentials and is satisfied that each is qualified

---

[1] The Court's page references correspond to the pagination generated by CM/ECF.

to offer the opinions discussed below. *Accord Borochov v. Islamic Repub. of Iran*, 589 F. Supp. 3d 15, 26 (D.D.C. 2022) (accepting expert reports as sufficient to meet plaintiffs' evidentiary burden); *see also Fissler v. Islamic Repub. of Iran*, 2022 WL 4464873, at *2 (D.D.C. Sept. 26, 2022) (qualifying Smyth as an expert on Iran's relationship with militia groups and those militia groups' terrorism tactics).

The Court starts with findings of fact. Then it proceeds to jurisdiction, merits, and damages.

## II.   FINDINGS OF FACT

### A.   The Taliban and the Haqqani Network

The Taliban is a "militant group operating mainly in Afghanistan and Pakistan." *Selig v. Islamic Repub. of Iran*, 573 F. Supp. 3d 40, 52 (D.D.C. 2021).[2]  And as Smyth explains in his expert report, the Taliban and Haqqani Network are closely connected. The Haqqani Network "is a quasi-autonomous organization" that "functions as the Taliban's core leadership and fighting group." Smyth Rep. ¶ 27; *see also Selig*, 573 F. Supp. 3d at 52 (finding that the Haqqani Network and the Taliban "operate as a single entity"). Like the Taliban, the Haqqani Network is designated as a foreign terrorist organization by the United States. *See Foreign Terrorist Organizations*, U.S. Dep't of State, https://www.state.gov/foreign-terrorist-

---

[2]  The Court may not take "judicial notice of the *truth* of findings and conclusions" from other cases "absent some particular indicia of indisputability." *Murphy v. Islamic Repub. of Iran*, 740 F. Supp. 2d 51, 58 (D.D.C. 2010) (cleaned up) (emphasis added). No such indicia appear here given the "one-sided" nature of this proceeding. *Id.* at 58–59. Still, "the FSIA does not require this Court to relitigate issues that have already been settled in previous decisions." *Id.* at 59 (cleaned up). So "the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Id.* The Court does so here, drawing on uncontroverted facts from other cases only when they accord with the evidence presented by Plaintiffs here.

organizations/ (last accessed Dec. 15, 2023).  And it "actively work[s] . . . with other terrorist organizations," especially al-Qaida.  Smyth Rep. ¶ 27.

For years, the Taliban and the Haqqani Network were at odds.  *See Selig*, 573 F. Supp. 3d at 52.  But they began working together in the 1990s and "grew even closer during the U.S. invasion" of Afghanistan.  *Id.* at 52–53 (recounting various connections).  Because of this, "the original distinctions between these two groups . . . collapsed."  *Id.* at 53.

### B.  Iran's Support for the Taliban and Haqqani Network

The Court has recently recounted Iran's history of sponsoring terrorist groups.  *See generally Roth v. Islamic Repub. of Iran*, 651 F. Supp. 3d 65, 73–77 (D.D.C. 2023); *Brown v. Islamic Repub. of Iran*, 2023 WL 4824740, at *2–3 (D.D.C. July 27, 2023).  The Court nonetheless "expounds on those findings" below with additional evidence presented by Plaintiffs' experts.  *Murphy v. Islamic Repub. of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010).

Iran's relationship with the Taliban and Haqqani Network began in earnest around 2000.  Smyth Rep. ¶ 34.  In the years that followed, Taliban leadership publicly visited Iran "numerous times."  *Id.*  But the links between Iran and the Taliban do not stop there.  At one point, a Taliban faction "was based in Iran."  *Id.* ¶ 22.  And Taliban leaders have received "monetary support and individualized training" to "help build Taliban tactical and combat capabilities."  *Id.* ¶ 24 (cleaned up).  As Aryan puts it, "Iran systematically and purposefully provided material support to the Taliban throughout all times relevant to this case, and increasingly so beginning in 2015."  Aryan Rep. ¶ 35.

Iran's financial assistance to the Taliban and Haqqani Network has taken many forms.  One is "direct funding."  *Id.* ¶ 49.  For instance, it paid bounties to the Taliban for each Afghan or American soldier killed—$1,700 for an Afghan soldier and $1,000 for a U.S. servicemember.

*See id.*  And it has sent payments directly to Taliban fighters' families.  *See id.*  Iran has also funded the Taliban indirectly "by enabling the group's international narcotics trade."  *Id.* ¶ 48. That money has "allow[ed] . . . the Taliban to rapidly and effectively develop and deploy forces eager to attack U.S. interests within Afghanistan."  *Id.*

Both terrorist organizations also receive weapons and equipment from Iran.  *See* Aryan Rep. ¶ 5 ("During my work, I uncovered numerous Iranian-made weapons used in battles by the Taliban.").  Smyth claims that Iran's "transfer of . . . weapons systems[] and technology related to explosive devices" is "particularly" noticeable when it comes to vehicle borne improvised explosive devices (VBIEDs).  The use of VBIEDs packed with ammonium nitrate is "an institutionalized technique utilized by Tehran."  Smyth Rep. ¶ 15.  Indeed, Iran "pioneered" "this type of bomb makeup and its use in VBIEDs."  *Id.* ¶ 41.

The expert reports here accord with the Court's findings in other cases.  For instance, this Court has previously found that Iran coordinated with, and provided a safe haven to, the Taliban and the Haqqani Network.  *See, e.g.*, *Selig*, 573 F. Supp. 3d at 53.  And the Court has also found that Iran has helped train, finance, and arm these organizations.  *See, e.g.*, *id.* at 53–54.

### C.  Attack Against the Security Contractors

On May 31, 2017, a vacuum truck packed with 3,300 pounds of explosives rumbled into Zanbaq Square in Kabul.  *See* Aryan Rep. ¶¶ 29–30.  The terrorists' target was a satellite office of the U.S. Embassy called the Jefferson Building.  *See id.* ¶ 26.  The truck made it through the Square's first checkpoint.  *See id.* ¶ 30.  But guards at Jefferson's outer checkpoint turned it away.  *See id.*  So the driver adapted, turning left to reach Jefferson from a different direction. *See id.*  But that plan was foiled too, when guards at the nearby German Embassy's checkpoint

stopped the truck and asked to inspect it.  *See id.* ¶ 31.  Out of options, the driver detonated the bomb.  *See id.*

The blast was catastrophic.  It killed over 90 civilians, injured another 400, and left a 30-foot-wide crater where the truck was parked.  *See id.*  Among those killed were eight Afghan security contractors working for the United States.  *See* Estate Reps. Affs., ECF Nos. 28-3 through 28-10.  In this lawsuit, they are known as John Does 1 through 8, or the Contractors for short.  Each was working near the blast and was instantly killed.  *See* Pls.' Resp. to Show Cause Order (Damages Mem.) at 51, ECF No 31.

Both experts blame Iran, the Taliban, and the Haqqani Network for the attack.  Smyth concludes that "[t]he Taliban and the Haqqani Network, acting in concert, carried out the Zanbaq Square bombing."  Smyth Rep. ¶ 65.  To him, "[t]here is no other reasonable explanation." *Id.*  Aryan agrees.  He believes that "Iran, working alongside and through the Taliban, actively sought" to carry out this bombing as a "means of retaliation against the United States" for killing an Iranian ally.  Aryan Rep. ¶ 36.  Of course, this attack predated the Taliban's recent restoration to power in the Afghan government.

### III.  LEGAL STANDARDS

The Court may enter a default judgment against a party who fails to appear.  Fed. R. Civ. P. 55(b)(2).  But the entry of a default judgment "is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  The Court must first determine whether it has subject matter jurisdiction over the matter.  *Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  And it must also "satisfy itself that it has personal jurisdiction."  *Mwani*, 417 F.3d at 6.

In cases like this where the defendant is a sovereign state, special procedures govern. The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in United States

courts." *Mohammadi*, 782 F.3d at 13 (cleaned up).  Generally, foreign states are immune from suit under the FSIA.  But that immunity "is subject to a number of exceptions." *Id.* at 13–14. Plaintiffs claim that Iran is liable under the terrorism exception in 28 U.S.C. § 1605A.  That section provides subject matter jurisdiction over, and a federal cause of action against, foreign states that engage in terrorism.  *See Borochov*, 589 F. Supp. 3d at 30.  Plus, it "addresses personal jurisdiction by specifying procedures that a plaintiff must follow to effect service on a foreign state." *Id.*

Different evidentiary burdens accompany personal and subject matter jurisdiction.  For personal jurisdiction, Plaintiffs must only make a "prima facie showing of jurisdiction." *Mwani*, 417 F.3d at 6–7.  But for subject matter jurisdiction, Plaintiffs must "establish[] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  Without binding law from the FSIA or the D.C. Circuit, district courts have discretion to determine "how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Dem. People's Repub. of Korea*, 774 F.3d 1044, 1046–51 (D.C. Cir. 2014).  Courts must also "adjust evidentiary requirements to . . . differing situations." *Id.* at 1048 (cleaned up).  Still, any evidence must be admissible and "sufficient for a court to come to the 'logical conclusion' that the defendant is responsible for the plaintiffs' injuries." *Borochov*, 589 F. Supp. 3d at 30 (quoting *Han Kim*, 77 F.3d at 1051).

## IV.  ANALYSIS

The Court starts by assessing whether it has subject matter jurisdiction.  Next, the Court considers whether it has personal jurisdiction over Iran.  Then it examines Plaintiffs' causes of action and decides whether they prevail under specific theories of liability.  And finally, the Court evaluates Plaintiffs' entitlement to damages.

### A.   Subject Matter Jurisdiction

The terrorism exception comes with two threshold requirements:  First, the claimant or victim must be a U.S. national, a U.S. servicemember, a U.S. government employee, or "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment."  28 U.S.C. § 1605A(a)(2)(A)(ii).  And second, the State Department must have designated the foreign government as a state sponsor of terrorism at both the time of the attack and when a resulting claim is filed.  *See id.* § 1605A(a)(2)(A)(i)(I).

Plaintiffs meet both prerequisites.  John Does 1 through 8 were serving as security contractors for the United States when the blast killed them.  *See* Mot. for Default J. (MDJ) Exs. 3–10, ECF Nos. 27-5 through 27-12.  And the State Department has designated Iran as a state sponsor of terrorism since 1984.  *See State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism (last accessed Dec. 15, 2023).

Having satisfied these initial requirements, Plaintiffs must also show that their claims fall within the terrorism exception's waiver of sovereign immunity.  The waiver applies only when:

> [1] money damages are sought against a foreign state [2] for personal injury or death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [5] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  Plaintiffs' Complaint satisfies the first two elements.  They ask for money damages from Iran.  *See* Am. Compl. at 35–40, ECF No. 35 (describing prayer for relief). And they do so based on the Contractors' deaths.  *See id.* at 23–35 (listing causes of action).  So the Court turns to the last three elements: extrajudicial killings, material support, and causation.

### 1. The Contractors' Deaths Constitute Extrajudicial Killings

Plaintiffs must show that the Contractors died in an "extrajudicial killing."  28 U.S.C. § 1605A(a)(1).  The Zanbaq Square bombing counts as an extrajudicial killing.  The FSIA defines "extrajudicial killing" by borrowing that phrase's definition from the Torture Victim Protection Act of 1991 (the TVPA), Pub. L. No. 102-256, 106 Stat. 73 (1992).  *See* 28 U.S.C. § 1605A(h)(7).  The TVPA, in turn, calls an extrajudicial killing "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  TVPA § 3(a), 106 Stat. at 73 (codified at 28 U.S.C. § 1350 note).  So Plaintiffs must show that the Contractors died in: "(1) a killing; (2) that [was] deliberated; and (3) [was] not authorized by a previous judgment pronounced by a regularly constituted court."  *Owens*, 864 F.3d at 770.

Plaintiffs easily meet the first element.  The bombing instantly killed John Does 1 through 8.  Damages Mem. at 51.  And their relatives either identified their bodies or were informed of their passing through other channels.  *See* MDJ Ex. 3 ¶ 16; Ex. 4 ¶ 17; Ex. 5 ¶ 15; Ex. 6 ¶ 18; Ex. 7 ¶ 12; Ex. 8 ¶ 19; Ex. 9 ¶ 11; Ex. 10 ¶ 15.

The killing was also deliberate.  As Aryan explains, the Zanbaq Square attack was carried out in retaliation for the American killing of an "Iranian ally," Mullah Mansour, the year earlier.  Aryan Rep. ¶¶ 26, 35.  That suggests planning.  More, he says that smuggling the explosives, "keeping them in a safe place, and then finding an explosives expert to place them in the vacuum truck tank" was a tricky task, which is "why it took about a year to execute the plan."  *Id.* ¶ 29.

Finally, the Taliban killed John Does 1 through 8 "without due process."  *Han Kim*, 774 F.3d at 1050.  "There is no question that these acts of terrorism lacked the traditional protections

of due process." *Selig*, 573 F. Supp. 3d at 60–61.  So Plaintiffs have established all three elements of an extrajudicial killing.

### 2. Iran Materially Supported the Taliban and Haqqani Network

As detailed above, Iran provided various forms of support to the Taliban and the Haqqani Network.  Iran provided training.  *See* Smyth Rep. ¶ 24.  And it provided weapons.  *See* Aryan Rep. ¶ 5; Default Mem. at 8.  It even gave the organizations direct payments and propped up the Taliban's narcotics trade.  *See* Smyth Rep. ¶ 48.  So Plaintiffs have offered enough evidence to show that Iran materially supported the Taliban and Haqqani Network.  They have also shown that Iran's support came from "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1); *see* Smyth Rep. ¶¶ 16–26 (describing Taliban support from Iranian leadership).

### 3. Iran's Material Support Proximately Caused the Contractors' Extrajudicial Killings

Plaintiffs must finally show that Iran proximately caused the victims' deaths by providing the terrorist groups with material support to carry out the extrajudicial killings.  *See Selig*, 573 F. Supp. 3d at 61.  Proximate cause requires a "reasonable connection" between the defendant's conduct and the plaintiff's harm.  *Id.* (quoting *Owens*, 864 F.3d at 794).  Here, that means Plaintiffs must show both that Iran's "actions were a *substantial factor* in the sequence of events that led to their deaths and that their [deaths] must have been *reasonably foreseeable* or anticipated as a natural consequence of [Iran's] conduct."  *Id.* (quoting *Owens*, 864 F.3d at 794) (emphasis added).  To do that, "it is enough for Plaintiffs to have shown that Iran's financial and military aid . . . played a significant role in aiding [the terrorist groups'] operational capacity."  *Id.* (cleaned up).

Plaintiffs' expert reports demonstrate this degree of connection.  Take Aryan's bottom-line conclusion:  "The deaths of the eight Afghan contractors . . . were the direct and foreseeable consequence of the material support and direction provided to the Taliban by Iran."  Aryan Rep. ¶ 37.  He holds this conclusion to "a reasonable degree of certainty" given the attack's nexus to the United States' killing of Mullah Mansour, an Iranian ally and "leader of the Taliban."  *Id.* ¶ 35.  After the leader's assassination, Iran and the Taliban worked together to "actively [seek] out means of retaliation against the United States in Afghanistan."  *Id.* ¶ 36.  And the bombing near the Jefferson Building—executed around the anniversary of Mansour's death—"was the first of those retaliatory attacks."  *Id.* ¶¶ 23, 36.  All this, combined with Aryan's "deep knowledge of the region and fifteen years of on-the-ground engagement," leaves him with "no doubts" that "the Iranian Revolutionary Guard and [t]he Islamic Republic [were] the main sponsor[s] of the May 31, 2017 Kabul bombing."  *Id.* ¶ 38.

Smyth agrees.  In his view, "the Taliban and Haqqani Network . . . carried out the Zanbaq Square bombing," and it "was committed with Iranian support, inspiration, and funding."  Smyth Rep. ¶¶ 65–66.  Smyth backs this conclusion by noting the various ways that Iran supported the terrorist organizations.  *Id.* ¶¶ 46–49.  And to him, one point of connection stands out—the type of bomb used in the attack.  The attacker's truck was packed with a mix of plastic explosives and ammonium nitrate, a deadly cocktail signaling "an Iranian connection."  *Id.* ¶¶ 40–41.  This alone constitutes powerful evidence that Iran's assistance was a "substantial factor in the sequence of events" leading to the Contractors' deaths.  *Selig*, 573 F. Supp. 3d at 61 (quoting *Owens*, 864 F.3d at 794).

Smyth also states that the Contractors' deaths were reasonably foreseeable byproducts of Iran's illicit aid.  While he thinks the attack may have been aimed at another target initially, the

place of its eventual detonation "suggests the bomb was meant for an American target or for the German embassy" nearby.  Smyth Rep. ¶ 56.  In his view, "it is highly likely that this secondary target was surveyed or at least shared with" the attackers.  *Id.* ¶ 57.

Based on this uncontested evidence, the Court finds that Iran's material support to the Taliban and Haqqani Network proximately caused the Contractors' extrajudicial killings.  Iran appeared set on revenge.  It provided funding, training, and weapons to groups bent on killing Americans.  That support was a substantial factor behind the attack.  And the Contractors' resulting deaths were reasonably foreseeable.  Given the sheer degree of entanglement between Iran and the Taliban, Iran must have had "an awareness of how [its] support would be used." *Selig*, 573 F. Supp. 3d at 61.  So Plaintiffs have met the terrorism exception, stripping Iran of immunity and granting the Court subject matter jurisdiction.  *See* 28 U.S.C. § 1605A(a)(1).

**B.  Personal Jurisdiction**

The Court has personal jurisdiction over a foreign state when it has subject matter jurisdiction and plaintiffs have served process as required in 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b).

Section 1608 "provides four methods of service in descending order of preference." *Barot v. Emb. of the Repub. of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).  First, plaintiffs can deliver "a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision."  28 U.S.C. § 1608(a)(1).  Second, plaintiffs can deliver "a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents."  *Id.* § 1608(a)(2).  Third, plaintiffs can "send[] a copy of the summons and complaint and a notice of suit . . . by any form of mail requiring a signed receipt, to be addressed and dispatched by the

12

clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). And fourth, if the others do not work, plaintiffs can serve the documents through the State Department. *Id.* § 1608(a)(4).

Here, Plaintiffs could not use the first two routes because the United States and Iran lack a "special arrangement" for service of process, "and Iran is not party to an international convention on service of judicial documents." *Selig*, 573 F. Supp. 3d at 62. Plaintiffs tried the third route, foreign mailing, but that failed. *See* Default Mem. at 27 ("The Clerk's office indicated that it was unable to complete service in this manner."). So Plaintiffs followed the fourth route and served Iran through the State Department. *See id.*; *see also* Return of Service Aff., ECF No. 22.

The Court has subject matter jurisdiction and Plaintiffs properly served Iran. So the Court has personal jurisdiction over Iran.

### C. Plaintiffs Have Alleged Viable Causes of Action

Plaintiffs here fall into two groups: the estates' Representatives and the Contractors' Relatives. This distinction matters because the Representatives may rely on the federal cause of action contained in § 1605A(c), but the Relatives must resort to state law or its foreign equivalent. A glance at the FSIA's structure supports this conclusion.

The FSIA's terrorism exception has both "strong" and "weak" functions. In its strongest form, the exception strips a foreign state of its sovereign immunity *and* it provides plaintiffs a cause of action. The cause of action appears in § 1605A(c). To recover under it, a plaintiff must show "personal injury or death caused by acts described in [the terrorism exception]" contained in § 1605A(a)(1). 28 U.S.C. § 1605A(c). Put another way, a plaintiff can state a claim under § 1605A(c) whenever the terrorism exception applies and confers subject matter jurisdiction.

But the FSIA's cause of action has limits.  Only certain individuals can invoke it:  U.S. nationals, U.S. servicemembers, U.S. Government employees and contractors, or the legal representatives of these individuals.  *See id.* § 1605A(c)(1)–(3).  Those "[i]neligible to invoke § 1605A(c)'s new federal cause of action" may still rely on the "terrorism exception to overcome [Iran's] sovereign immunity."  *Opati*, 150 S. Ct. at 1606.  But then they must "advance claims sounding in state law" or its foreign equivalent.  *Id.*; *see also Fraenkel v. Islamic Repub. of Iran, Ministry of Foreign Affs.*, 892 F.3d 348, 353 (D.C. Cir. 2018) (noting ineligible plaintiffs "may continue to pursue claims under applicable . . . foreign law" (cleaned up)).  This is the FSIA's terrorism exception in its weaker form:  it still strips the foreign state of immunity but grants no federal cause of action.

Groundwork laid, the Court evaluates Plaintiffs' claims, starting with the Representatives.

### 1.   The Representatives

The estates' Representatives sue under the FSIA's federal cause of action.  Am. Compl. ¶¶ 153–232 (grounding Counts I through VIII in 28 U.S.C. § 1605A(c)), ECF No. 33.  And as far as establishing liability goes, they have carried their burden.  The Court has already found that the terrorism exception applies and confers subject matter jurisdiction over this dispute.  *See supra* Section IV.A.  So that analysis also shows that the FSIA's cause of action is available to the Representatives.  *See Borochov*, 589 F. Supp. 3d at 35 ("The Court's subject matter jurisdiction analysis shows that the exception's cause of action is available here.").

The Representatives further suggest they prevail under the FSIA's cause of action because they are entitled to relief under various "common law tort theories."  Default Mem. at 29.  This half-federal, half-state approach draws support from *Bettis v. Islamic Republic of Iran*,

315 F.3d 325, 333 (D.C. Cir. 2003), which cautioned courts against creating "federal common

law" for FSIA claims.  *See also Fraenkel*, 892 F.3d at 353 ("The courts are not authorized to

craft a body of federal common law in deciding FSIA terrorism exception cases.").  But this

warning seems outdated because § 1605A(c) did not exist when the D.C. Circuit decided *Bettis*.

When *Bettis* was decided in 2003, the FSIA's terrorism exception lacked "a federal cause

of action against foreign states."  315 F.3d at 333.  So some courts incorporated one from state

law; others fashioned it from "federal common law."  *Id.  Bettis* cleared up this confusion.  The

FSIA said that a "foreign state shall be liable in the same manner and to the same extent as a

private individual under like circumstances."  28 U.S.C. § 1606.  So the Circuit directed courts to

"look[] to the common law of the states" to discern the bounds of a plaintiff's cause of action.

*Bettis*, 315 F.3d at 333.  And because the Restatement serves "as a proxy for state common law,"

the Circuit also accepted it as a measure of "the controlling substantive law."  *Id.*

But Congress disrupted this landscape in 2008 when it "created an express federal cause

of action for acts of terror."  *Opati*, 140 S. Ct. at 1606; *see also* Nat'l Defense Authorization Act

for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 339–40 (2008).  And Congress

made the elements of this new cause of action coextensive with the immunity waiver in

§ 1605A(a)(1).  *See* 28 U.S.C. § 1605A(c) (permitting liability "for personal injury or death

caused by acts described in subsection (a)(1)").  To be sure, state and foreign law still has a place

in FSIA litigation for plaintiffs who are "[i]neligible to invoke § 1605A(c)'s new federal cause of

action."  *Opati*, 140 S. Ct. at 1606.  But eligible plaintiffs pressing claims under § 1605A(c) need

not *also* establish their ability to recover under some other source of substantive law.

One caveat:  the D.C. Circuit has signaled that "well-established statements of common

law" may still be relevant "in determining damages under § 1605A(c)."  *Fraenkel*, 892 F.3d at

353.  But the Court sees little need to resort to those statements here.  The FSIA entitles the

Representatives to "economic damages, solatium, pain and suffering, and punitive damages."

§ 1605A(c).  So as long as the Representatives prove these damages "by a reasonable estimate,"

they are entitled to them.  *Fraenkel*, 892 F.3d at 353.

All told, the Representatives have adequately proven their claims under § 1605A(c).

## 2.   The Relatives

Things work differently for the Relatives.  Because they lack access to the cause of action

in § 1605A(c), they must rely on state or foreign law for their cause of action.  But that requires a

threshold determination of *which* jurisdiction's law applies.  *See Oveissi v. Islamic Repub. of

Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009).  For the reasons stated below, the Relatives' claims

must proceed under Afghan law.  And under that law, the Relatives' claims succeed.

### a.   Choice of Law

Start with the choice-of-law issue.  Two jurisdictions have an interest in this dispute:

Afghanistan, the location of the attack and nationality of the Contractors' Relatives; and the

District of Columbia, the forum state where Plaintiffs have sued.  *See Thuneibat v. Syrian Arab

Repub.*, 167 F. Supp. 3d 22, 41 (D.D.C. 2016).  There is a "true conflict" between the law of

these jurisdictions.  *Id.* at 42 (quoting *Barimany v. Urb. Pace LLC*, 73 A.3d 964, 967 (D.C.

2013)).  Afghan law permits solatium damages for family members "up to the second degree."

Exp. Rep. of Rohullah Azizi (Azizi Rep.) ¶¶ 24, 49(h), ECF No. 31-1.  But in the District,

solatium damages are unavailable "to compensate an immediate family relative for their grief

arising from the loss of a loved one."  *Thuneibat*, 167 F. Supp. 3d at 42.  Given the conflict, the

Court must decide which jurisdiction's law controls.

The District of Columbia's choice-of-law rules guide the inquiry.  *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1509–10 (2022).  Its rules meld a "governmental interest analysis" with a "most significant relationship test."  *W.A. v. Islamic Repub. of Iran*, 427 F. Supp. 3d 117, 139 (D.D.C. 2019).  The first part of the analysis "evaluates the governmental policies underlying the applicable laws and determines which jurisdiction's policy would be most advanced by having its law applied" to the case.  *Id.* (cleaned up).  Then the second part calls for a consideration of four factors from the Second Restatement of Conflict of Laws:  (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the parties' domicile, residence, and nationality; and (4) "the place where the relationship, if any, between the parties is centered."  *Id.* (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971)).

The Relatives urge the Court to evaluate their intentional infliction of emotional distress claim under D.C. law.  *See* Default Mem. at 30.  But the Court disagrees and concludes "that the factors overwhelmingly point in the direction of [Afghanistan]."  *Oveissi*, 573 F.3d at 842.

The first part of the test is inconclusive.  On the one hand, Afghanistan has a significant interest in protecting its citizens against terrorist attacks and in vindicating victims of these attacks.  *Cf. id.* ("France has a strong governmental interest in both deterring attacks within its sovereign borders and ensuring compensation for injuries to its domiciliaries.").  And going by the uncontroverted evidence here, Afghanistan still maintains these interests despite the "recent transition" in its "political landscape since August 2021."  Azizi Rep. ¶ 6.  On the other hand, the United States also has a strong interest in protecting its contractors.  *See, e.g.*, *Est. of Doe v. Islamic Repub. of Iran*, 808 F. Supp. 2d 1, 22 (D.D.C. 2011) (applying D.C. law to claims based on a terrorist attack in Lebanon).

But even if the first part of the test is a wash, the remaining factors tilt decisively toward Afghan law. The injuries occurred in Afghanistan. So did the conduct causing the injuries. And all the Relatives are Afghan nationals, most of whom still live in Afghanistan. *See* Mot. to Proceed Anonymously ¶ 3, ECF No. 1 ("Plaintiffs are, for the most part, citizens and residents of Afghanistan."). These factors strongly favor Afghan law. Indeed, the Relatives' chief tie to the United States is their relationship to Afghan contractors working for the United States in Afghanistan. Beyond that, the Relatives have advanced no other connections to the United States—much less the District of Columbia.

And this last point merits emphasis. Even if the Relatives could show that the United States had some overwhelming interest in this case, they would still have to show *which* jurisdiction's common law provides the rule of decision. And on this record, the Relatives have not shown why the District has a stronger interest than, say, Arkansas or Alaska. *Cf. Dammarell v. Islamic Repub. of Iran*, 2005 WL 756090, at *19 (D.D.C. Mar. 29, 2005) ("The District of Columbia can lay claim to very little interest in this case."). Merely suing here is insufficient. So the Court concludes Afghan law governs the Relatives' claims. *Accord Oveissi*, 573 F.3d at 842–43 (applying French law to a U.S. citizen's claim based on terrorist attack in France); *Borochov*, 589 F. Supp. 3d at 37–38 (applying Israeli law to Israeli citizens' claims based on terrorist attack in Israel).

**b.  Liability Under Afghan Law**

When applying foreign law, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Earlier this year, the Court directed the Relatives to provide information about Afghan law. *See* Order, ECF No. 29. In response, the Relatives filed an

expert report from Professor Rohullah Azizi.[3]  His report surveys potentially applicable Afghan

law and concludes it "allows the Family Member Plaintiffs . . . to recover against Iran for

damages caused by the Zanbaq Square bombing."  Azizi Rep. ¶ 49(a).

Under Afghan law, when there is no "clear statutory provision[] endorsing customary

practices," courts rely "primarily . . . on the provisions" of the Civil Code of Afghanistan.  *Id.*

¶ 19.  So Azizi relies on the Civil Code of Afghanistan, which "acknowledges the potential for

harm to secondary victims, particularly . . . where the deceased was financially supporting a

family."  *Id.* ¶ 20.  He points to Article 797, which stipulates that "if a person possesses technical

instruments or other objects requiring special attention to prevent harm, they will be considered

liable in case of harm inflicted by these items."  *Id.* ¶ 30.  To avoid liability, that person must

"prove that adequate precautions were taken to prevent harm."  *Id.*  Under this theory, a claimant

must prove harm and causation.  *See id.*

The Court finds that the Relatives can recover against Iran under Article 797 because it is

the closest comparator (at least on this uncontroverted record) to the intentional infliction of

emotional distress claim the Relatives pleaded.  *See* Am. Compl. ¶¶ 233–41; *see also Borochov*,

589 F. Supp. 3d at 39 (permitting pleaded claim to be governed by analogous foreign law).  A

bomb is an "object[] requiring special attention to prevent harm."  Azizi Rep. ¶ 29.  And Iran's

"funding of a violent insurgent group" is similarly analogous to "possessing a dangerous object."

*Id.* ¶ 30.

---

[3]  Azizi graduated in the top of his class with a Bachelor's in law from Kabul University.  Azizi
Rep. at 4.  He then earned his LL.M. from Tulane University School of Law.  *See id.*  Azizi has
served as a law professor at Afghan universities, and he worked as a Curriculum Advisor for the
Afghanistan Legal Education Project at Stanford Law School.  *See id.* at 4–5.

So Article 797 controls. *Id.* ¶ 49(b). And the Relatives have shown their "right to relief" under this law "by evidence satisfactory to the [C]ourt." *Fraenkel*, 892 F.3d at 353. First, they have shown harm; the Contractors were killed, and their Relatives have suffered serious financial consequences. *See* Family Affs., ECF Nos. 32-4 through 32-11. Second, they have shown that "the harmful act" proximately caused the damage they incurred. Azizi Rep. ¶ 27(c). The terrorists' failure to "pay special attention to prevent harm" foreseeably resulted in the Contractors' deaths and the ensuing financial harm to their families. *Id.* ¶ 30. Through its material support to the Taliban and Haqqani Network, Iran contributed to that harm. *Id.* ¶ 49(c).

More, Azizi says that none of the potentially applicable defenses apply. *See id.* ¶ 49(d); ¶ 47 (listing potential defenses). The Court agrees. Lack of capacity and lack of free will can be dismissed out of hand. *See id.* ¶ 47(a)–(b). So too with self-defense because the bombing was an unjustified act of aggression, not an act meant to defend "oneself or one's property." *Id.* ¶ 47(c). Finally, Iran cannot claim "contributory negligence or assumption of risk." *Id.* ¶ 47(d). The Contractors did not "increase their harm by their own actions," nor did they "assume the risk" that they would be killed by a *terrorist* attack. *Id.*

For these reasons, the Relatives may recover against Iran under Afghan law.

## D. Damages

In uncontested cases, damage awards for acts of terrorism require the plaintiffs to "prove that the consequences of the defendants' acts were reasonably certain to occur, and [they] must prove the amount of damages by a reasonable estimate." *Abedini v. Islamic Repub. of Iran*, 422 F. Supp. 3d 118, 136 (D.D.C. 2019) (cleaned up). Plaintiffs have already shown that death and emotional distress were reasonably foreseeable consequences of Iran's actions. *See supra* Section IV.A.3. So the Court turns to whether Plaintiffs have proven the extent of their damages

"by a reasonable estimate." *Abedini*, 422 F. Supp. 3d at 136 (cleaned up).  Like liability, however, the controlling law for damages differs for the Representatives and Relatives.  So the Court addresses each in turn.

### 1.  The Representatives

The Representatives' entitlement to damages comes from the FSIA.  It states their "damages may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c).  And it says that "a foreign state shall be vicariously liable for the acts of its officials, employees and agents."  *Id.*  The Representatives only seek economic and punitive damages against Iran.  So the Court evaluates their entitlement to each.

### a.  Economic Loss Damages

Plaintiffs retained economists Chad L. Staller and Stephen M. Dripps from the Center for Forensic Economic Studies to evaluate the loss of economic and household support resulting from the Contractors' deaths.  Staller and Dripps have the academic credentials and experience necessary to opine on economic loss damages.  *See* Econ. Rep. at 42–49, ECF No. 32-3.  And their opinions have previously served as the basis of damage awards in this district.  *See, e.g.*, *Selig*, 573 F. Supp. 3d at 65.

A brief word on the economists' materials and methods.  Staller and Dripps consulted many materials to reach their conclusions.  For instance, they consulted family member affidavits, employment contracts, a household services questionnaire, and additional information provided by Plaintiffs' counsel.  *See* Econ. Rep. at 1, 7, 11, 16, 21, 26, 31, 37.  Using this information, Staller and Dripps gauged the life expectancy of each deceased contractor and

calculated the value of their lost household services.[4]  *See, e.g., id.* at 2–3; *see also Opati v. Repub. of Sudan*, 60 F. Supp. 3d 68, 77 (D.D.C. 2014) (concluding "household services lost" constitutes a form of recoverable economic damages).  The economists assessed each contractor's household services by multiplying their hourly compensation by the number of hours they spent performing household services, such as providing educational assistance to family members (*see* Econ. Rep. at 2), keeping the house in order (*see id.* at 7), and caring for children (*see id.* at 12).  Then these estimations were increased to account for future growth and decreased to account for present value.  *See, e.g., id.* at 3.

A few months ago, the Court identified a potential flaw in this methodology:  the use of "average life expectancy at birth *as of 2021*."  Order at 1, ECF No. 33 (quoting Econ. Rep. at 2) (emphasis added).  Because none of the Contractors was born in 2021, the Court queried whether the economists' valuations were based on reasonably accurate life expectancies.  *See id.* at 2.

In response, Plaintiffs said that Staller and Dripps stand by their original estimations for two reasons.  *See* Pls.' Resp. to Order Regarding Econ. Damages, ECF No. 37.

First, the pair note in their supplemental report that "historical and specific data" for life expectancy in Afghanistan "is simply unavailable."  Suppl. Econ. Rep. at 1, ECF No. 37-1.  So they used "a methodology that is as accurate as possible based upon available relevant data."  *Id.*  Here, that meant using "the most recent life expectancy data provided by The World Bank."  *Id.*

---

[4] Curiously, the Representatives do not seek lost wages yet use the Contractors' wages to estimate the value of their household services.  This approach is far from normal, but given the lack of readily ascertainable alternative values and the absence of objections from Iran, the Court will largely adopt their approach.  Of course, the Representatives only had to provide a reasonable estimation of their economic damages.  *See Fraenkel*, 892 F.3d at 353.  And the Court finds that the economists' valuations generally fall within this ballpark.

And second, Staller and Dripps claim their conclusions are conservative given how life expectancy is measured. *See id.* at 1–2. The World Bank's measure of life expectancy captures "the average number of years a newborn is expected to live if mortality patterns at the time of birth remain constant in the future." *Id.* at 1. But "high mortality in young age groups" causes the average measure of life expectancy to skew downward. *Id.* Controlling for a subject's present age increases their life expectancy. *See id.* That is why, for instance, an 80-year-old American has a life expectancy of 89.2 years, and a newborn only 77 years. *See id.* at 2. For these reasons, Staller and Dripps "stand[] by the life expectancy at birth figures applied in [their] initial report as the most accurate available estimate of anticipated life span applicable to this [case]." *Id.*

Given this added explanation, and without impeachment from defense, the Court is persuaded that Staller and Dripps' overall valuations represent "reasonable estimate[s]" of the Representatives' economic losses. *Fraenkel*, 892 F.3d at 353. So the Court turns to an assessment of economic losses attributable to each estate.

*i. Economic Loss for John Doe 1.* John Doe 1 was 26 when he died and had a life expectancy of 62 years. Econ. Rep. at 2. He made $2.60 per hour and his family said that he worked an average of 24 hours per week on household services. *Id.* Given these inputs, Staller and Dripps claim $120,322 captures the value of his total lost household services over his expected lifetime. *Id.* at 4. So the Court will award the Estate of John Doe 1 $120,322 in economic damages.

*ii. Economic Loss for John Doe 2.* John Doe 2 was 32 when he died and had a life expectancy of 62 years. Econ. Rep. at 7. He made $2.60 per hour and his family said that he worked an average of 18 hours per week on household services. *Id.* Given these inputs, Staller

and Dripps claim $77,507 captures the value of his total lost household services over his expected lifetime.  *Id.* at 9.  So the Court will award the estate of John Doe 2 $77,507 in economic damages.

       *iii. Economic Loss for John Doe 3*.  John Doe 3 was 29 when he died and had a life expectancy of 62 years.  Econ. Rep. at 12.  He made $2.88 per hour and his family stated that he worked an average of 29 hours per week on household services.  *Id.*  Given these inputs, Staller and Dripps claim $151,395 captures the value of his total lost household services over his expected lifetime.  *Id.* at 14.  So the Court will award the estate of John Doe 3 $151,395 in economic damages.

       *iv. Economic Loss for John Doe 4*.  John Doe 4 was 30 when he died and had a life expectancy of 62 years.  Econ. Rep. at 17.  He made $2.57 per hour and his family said that he worked an average of 29.5 hours per week on household services.  *Id.*  Given these inputs, Staller and Dripps claim $132,541 captures the value of his total lost household services over his expected lifetime.  *Id.* at 19.  So the Court will award the estate of John Doe 4 $132,541 in economic damages.

       *v. Economic Loss for John Doe 5*.  John Doe 5 was 43 when he died and had a life expectancy of 62 years.  Econ. Rep. at 22.  He made $1.96 per hour and his family stated that he worked an average of 31 hours per week on household services.  *Id.*  Given these inputs, Staller and Dripps claim $67,121 captures the value of his total lost household services over his expected lifetime.  *Id.* at 24.  So the Court will award the estate of John Doe 5 $67,121 in economic damages.

       *vi. Economic Loss for John Doe 6*.  John Doe 6 was 49 when he died and had a life expectancy of 62 years.  Econ. Rep. at 27.  He made $2.60 per hour and his family stated that he

worked an average of 40 hours per week on household services.  *Id.*  Given these inputs, Staller and Dripps claim $79,048 captures the value of his total lost household services over his expected lifetime.  *Id.* at 24.  So the Court will award the estate of John Doe 6 $79,048 in economic damages.

       *vii. Economic Loss for John Doe 7.*  John Doe 7 was 38 when he died and had a life expectancy of 77.3 years because his family permanently moved to the United States after his death and the economists "assume he would have resettled" with his family.  Econ. Rep. at 32. This assumption appears well-founded because he and his wife had applied for an American visa and had reached the interview stage before his death.  *See* John Doe 7 Family Affs. at 4, ECF No. 32-10.  If John Doe 7 had been able to join his family, he would have made $14.99 per hour according to the economists' estimates.  Econ. Rep. at 32.  And his family conveyed that he worked an average of 37 hours per week on household services.  *Id.*  Given these inputs, Staller and Dripps claim $838,188 captures the value of his total lost household services over his expected lifetime.  *Id.* at 35.  So the Court will award the estate of John Doe 7 $838,188 in economic damages.

       *viii. Economic Loss for John Doe 8.*  John Doe 8 was 28 when he died.  Econ. Rep. at 38. Plaintiffs argue he had a life expectancy of 81.3 years.  *Id.*  But this assumes that he would have joined his family in Turkey, where they relocated after his death.  *Id.*  And it assumes he would have lived past the age of 65.  *Id.*  The Court discredits both assumptions.  Unlike John Doe 7, who died while his family's visa application was pending, there is no indication John Doe 8 and his family had plans to move to Turkey prior to his death.  John Doe 8's Representative has given the Court no reason to believe the family would have emigrated but for this tragic attack.

And the economists simply speculate John Doe 8 "would have lived to [] age 65.0," which triggers a higher 81-year life expectancy. *Id.* The Representatives must prove their damages "by a reasonable estimate." *Selig*, 573 F. Supp. 3d at 64 (cleaned up). But they have plucked their life-expectancy baseline—age 65 instead of "at birth"—from guesswork, not evidence. And their methodology here is strikingly different than their methodology used with the prior Contractors. Because of these flawed assumptions, the Court will use the "at birth" Afghan life expectancy of 62 years that the economists used for John Does 1 through 6.

Nor have Plaintiffs or the economists established the effective hourly rate for John Doe 8. They simply pegged it to the "monthly minimum wage in Turkey," which the Court finds inapplicable for the reasons stated above. *Id.* And they somehow concluded that Turkey's minimum wage ($3.46 per hour) multiplied by 37 hours over the remainder of John Doe 8's inflated life expectancy (53 years) produces $5,283,745 in lost household services. But that math does not add up. Before factoring in future growth and present value adjustments, those variables ($3.46 per hour x 37 hours per week x 52 weeks x 53 years) produce a sum closer to $352,823. So the economists' $5,000,000-plus projection seems to miss by a country mile.

Instead, the Court uses John Doe 3's wage of $2.88 per hour—the highest Afghan wage in the record—as its baseline. *See id.* at 12. And because John Does 3 and 8 had similar remaining life expectancies (33 years), the Court multiplies John Doe 3's total loss figure for one weekly hour ($5,221) by the number of hours John Doe 8's family said he worked (37). That produces a total of $193,177 in lost household services over John Doe 8's expected lifetime. The Court finds that this figure represents a far more "reasonable estimate" of the economic losses incurred John Doe 8's estate. *Selig*, 573 F. Supp. 3d at 64 (cleaned up). So in an exercise of the

Court's "sound discretion," it will award the estate of John Doe 8 $193,177 in economic damages. *Id.* at 51 (cleaned up).

### b.   Punitive Damages

While the FSIA entitles the Representative to punitive damages, it does not specify the extent of those damages. *See* 28 U.S.C. § 1605A(c).  The Representatives seek $150 million in punitive damages for each estate. *See* Damages Mem. at 50.  But this Court and others have criticized the flat-fee approach to punitive damages for being "inflexibl[e]" and unhelpful in deterring Iran because it "already faces billions in punitive damage awards." *Selig*, 573 F. Supp. 3d at 76–77.  So instead the Court will adopt its usual practice in cases like this and award punitive damages in an amount that matches compensatory damages. *See, e.g.*, *id.* at 77 (collecting cases); *Borochov*, 589 F. Supp. 3d at 49 ("[T]he Court will award punitive damages equal to compensatory damages[.]").

This mirrored approach resonates with Supreme Court precedent. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513–15 (2008) (condoning a 1:1 ratio between punitive and compensatory damages).  It "meets the four objectives of punitive damages." *Selig*, 573 F. Supp. 3d at 77.  And it will still hopefully deter Iran "from continuing to sponsor terrorist activities." *Id.*  For these reasons, the Court will award the Contractors' estates a total of $1,659,299 in punitive damages, a sum that mirrors the estates' total economic loss damages. *See supra* Section IV.D.1.a.

### 2.   The Relatives

Now for the Relatives' damages.  Recall that Afghan law governs their cause of action. *See supra* Section IV.C.2.a.  So Afghan law should govern their damages, too, at least under the normal rule that damages are "calculated pursuant to the law under which liability was found."

27

*Thuneibat*, 167 F. Supp. 3d at 47.  But the Relatives propose a different path.  They argue Afghan law *entitles* them to solatium damages, but federal law governs the *extent* of those damages.  *See* Damages Mem. at 17.  The Court agrees.

Uncontroverted evidence shows that Afghan law permits relatives to recover damages for "intellectual harm."  Azizi Rep. ¶ 49(h).  And according to Plaintiffs' expert, intellectual damages are "essentially the same" as solatium damages.  *Id.*  Both compensate the claimant for "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort."  *Belkin v. Islamic Repub. of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also* Azizi Rep ¶¶ 36, 41(b) ("Generally, intellectual harm . . . refer[s] to non-physical, non-economic harm, such as emotional distress or psychological trauma" caused by "the death or serious injury of a relative").  Yet the record contains hardly any evidence on how the Court should calculate those damages under Afghan law.

That is where federal law comes in, says the Relatives.  They urge the Court to calculate damages under the framework established in *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006).  *See* Damages Mem. at 17.  Though it may seem counterintuitive, the Relatives' blended approach to damages complies with the D.C. Circuit's instruction that courts should "default to the application of federal law when there is a lack of information regarding the proper calculation of damages under foreign law."  *Fraenkel*, 892 F.3d at 358.  So given this instruction, and lacking adequate information on Afghan law, the Court looks to federal law to calculate the Relatives' solatium damages.  And the Court focuses its analysis on solatium damages because the Relatives seek nothing else.  *See* Damages Mem. at 16–18, 51–55.

To calculate the Relatives' damage awards, the Court uses the *Heiser* framework as its touchstone.  In that case, the court awarded $8 million to a decedent's spouse, $5 million to a child, $5 million to a parent, and $2.5 million to a sibling.  *See Heiser*, 466 F. Supp. 2d at 269. The Court recognizes that this framework serves as "a useful reference point" although it is "not binding precedent."  *Fraenkel*, 892 F.3d at 351.  That said, "many judges in this district adhere to the *Heiser* framework in awarding solatium damages."  *Selig*, 573 F. Supp. 3d at 65.  And the Court finds that framework fitting here.  Of course, future cases might be different.

*Heiser*'s tiered amounts "are not set in stone."  *Murphy*, 740 F. Supp. 2d at 79.  They can be adjusted up or down based on aggravating or mitigating circumstances.  *See id.*  But the Relatives here seek—and have proven their entitlement to—awards in step with *Heiser*'s baseline amounts.  *See* Damages Mem. at 51–55.  So that is the path the Court takes based on the following analysis of the Contractors' families.  The Court uses pseudonyms when referring to the Relatives because they "would face a serious risk of retaliatory harm" if their identities were publicly revealed.  *See* Order, ECF No. 2 (granting Plaintiffs' permission to proceed anonymously).

*a. Relatives of John Doe 1*.  John Doe 1 is survived by seven relatives suing here:  his father and mother (M.M. and Ha.), three brothers (A.M., A.Z., and Ma.), and two sisters (Mu. and Zu.).  *See* Damages Mem. at 18–23.

M.M. is John Doe 1's father and the legal representative of his estate.  *See* John Doe 1 Family Affs. at 1, ECF No. 32-4.  He says his relationship with John Doe 1 struck the balance between respect and friendship.  *Id.* at 2.  And their relationship extended beyond the home. M.M. trained John Doe 1 and the other Contractors to be security guards.  *Id.* at 1.  At some point, however, M.M. lost his hand, causing John Doe 1 to become the family's primary source

of income. *Id.* at 2.  When M.M. learned of his son's death, he became numb.  He says he "could not feel anything," and "felt as if he had lost all of [his] senses." *Id.*  Since then, M.M. has suffered from memory loss, apathy, anxiety, depression, nerve pain, chronic musculoskeletal and neuropathic pain, and muscle spasms. *Id.*  And he has received medical treatment for many of these ailments. *Id.*  To date, M.M. struggles with the reality of losing his son's companionship and support. *Id.*  Based on these facts, the Court awards M.M. $5,000,000 in solatium damages.

John Doe 1's passing also pained his mother, Ha.  When Ha. initially heard of the bombing, she was told her son survived unscathed. *Id.* at 7.  Yet reality hit hard when her son's coffin arrived at her home. *Id.*  She fainted and denied her son's death. *Id.*  In her own words:

> I felt that my heart died along with my son.  His absence is felt throughout our life.
> It is sensed spiritually, financially, mentally, and physically.  My son held a unique
> role in our family and kept the social bonds in the family strong.  His presence has
> been irreplaceable.

*Id.* at 8.  Since her son's death, Ha. has endured blood pressure abnormalities, nerve pain, immobility, and depression. *Id.*  Her physicians have prescribed several medications for her ailments and have told her that they stem from the stress of John Doe 1's death. *Id.*  She has "lost interest" in daily life, and she claims therapy has not alleviated "the pain and sorrow" in her life. *Id.*  She also has trouble facing a future without John Doe 1.  She especially "wanted to see [her] son get married and see his children." *Id.* at 9.  Yet "[t]his dream will never be fulfilled." *Id.*  Based on these facts, the Court awards Ha. $5,000,000 in solatium damages.

A.M. was shocked when he learned of the bombing and his brother's death. *Id.* at 13.  He immediately left his house to search for John Doe 1's body.  And he found it at the local hospital. *Id.*  A.M. lost his ability to attend university because John Doe 1 was paying his way. *Id.* at 14.  So although A.M. was studying to become a dentist, he now works as a blacksmith and has no plans to continue his education. *Id.*  A.M. will "always feel" his brother's loss, and suffers from

memory loss and physical weakness. *Id.* Based on these facts, the Court awards A.M. $2,500,000 in solatium damages.

John Doe 1's death similarly shattered dreams for A.Z. With John Doe 1's help and financial assistance, A.Z. was preparing to take university entrance exams. *Id.* at 19–20. But he abandoned this path after the bombing because no one else could finance his education. *Id.* Since his brother's death, he has "struggle[d] to make plans and decisions" and has been "unable to study well" or "focus on [his] lessons." *Id.* at 20. Based on these facts, the Court awards A.Z. $2,500,000 in solatium damages.

Ma. was roughly 11 years old when he lost his older brother. *Id.* at 23. When John Doe 1 died, Ma. "felt as though [he] had been smashed into pieces." *Id.* John Doe 1 had an especially close relationship with Ma. because Ma. was "the youngest brother." *Id.* He leaned on John Doe 1 for love and support "in all areas of [his] life." *Id.* And John Doe 1 "paid for all [of Ma.'s] necessities." *Id.* Ma. describes losing his big brother as "the most painful thing [he has] experienced," and it has left him with "a lifetime of sorrows and pain." *Id.* at 24. Indeed, he experiences "nightmares or night terrors" because of his brother's death. *Id.* Based on these facts, the Court awards Ma. $2,500,000 in solatium damages.

John Doe 1 brought "laughter and happiness" to his sister Mu. *Id.* at 27. She describes him as "a kind, loving, and honest person" who defended her against others and made her able to relax. *Id.* Though she first thought her brother survived the bombing with an injury to his leg, she became "totally shocked" when she learned he died. *Id.* at 28. Her eyes went "dark" for several hours upon hearing the news, and all she could do was "cry and scream." *Id.* Since his passing, Mu. has faced depression, nervousness, and a short temper. *Id.* Her doctors constantly tell her "to forget about that day," but she finds that "impossible." *Id.* Like her brothers, Mu.

had to drop out of school when John Doe 1 died.  *Id.*  Based on these facts, the Court awards Mu. $2,500,000 in solatium damages.

John Doe 1 left a similar impression on his other sister, Zu.  She "felt like the strongest person in the world because [her] brother loved, supported, and sponsored [her]."  *Id.* at 31.  Like her sister, Zu. thought her brother had only been injured.  *Id.*  So she fainted when she heard the news and woke up later in a hospital.  *Id.*  To this day, Zu. suffers from depression and thoughts of self-harm.  *Id.* at 32.  She "often feel[s] hatred for [herself] and others surrounding [her]."  *Id.*  Based on these facts, the Court awards Zu. $2,500,000 in solatium damages.

*b. Relatives of John Doe 2.*  John Doe 2 is survived by eight relatives suing here:  his wife (R.S.) and son (M.H.M.), father and mother (M.Y. and Na.), three brothers (A.F., A.Fd., and M.A.), and sister (Di.).  *See* Damages Mem. at 23–27.

A.F. is John Doe 2's older brother and the legal representative of his estate.  *See* John Doe 2 Family Affs. at 1, ECF No. 32–5.  A.F. was close with his brother and was shocked to learn of his passing.  *Id.* at 2.  When he got the news, he rushed to John Doe 2's wife and children.  *Id.*  He found them "in a very devastating situation."  *Id.*  Following Afghan custom, A.F. married his brother's wife "to care for her and their children."  *Id.*  He did so "to help keep their family together," but this caused him to forgo marrying the woman he loved.  *Id.*  The new arrangement also forced A.F. to drop out of school.  *Id.*  Despite all the disruptions, A.F. knows "[i]t was the right thing to do" and remains "proud of how [his] family has supported one another."  *Id.* at 3.  Based on these facts, the Court awards A.F. $2,500,000 in solatium damages.

R.S. is John Doe 2's widow.  *Id.* at 6.  She describes him as a "dutiful husband" who provided a "happy life" for her and her family.  *Id.*  She recalls cleaning the house when she received word about the bombing.  *Id.*  Yet she did not believe that her husband had died until

his coffin arrived at the house.  *Id.*  When she saw the coffin, her "entire world became dark."
*Id.* at 7.  And it slowly sank in that she "had lost [her] life partner and the support of [her] and
[her] children."  John Doe 2's death brought "long-lasting issues" to R.S.'s physical and
emotional health.  She sees his face everywhere she looks and suffers from anxiety, high blood
pressure, diabetes, and loss of vision.  *Id.*  Her doctor blames these ailments on the bombing and
her husband's death.  *Id.*  As a result of the financial difficulties caused by John Doe 1's passing,
she married A.F. even though neither of them desired that arrangement.  *Id.*  She also recounts
the emotional distress her young son experiences when he sees photos of his father.  *Id.* at 8.
Based on these facts, the Court awards R.S. $8,000,000 in solatium damages.

M.H.M. is the minor son of John Doe 2.  *Id.* at 7–8.  He was one and a half when his
father died.  *Id.* at 7.  Although he did not immediately comprehend the loss, his mother says
"[h]e fully realized the reality of his father's death at the age of three."  *Id.* at 8.  He often tells
R.S. that he remembers his father and "cries when he looks at his photos."  *Id.*  As a result,
M.H.M. has lost his appetite and become malnourished despite attempts to give him fortified
foods.  He also "wonders why his mother has married his uncle and struggles to cope with this
new family dynamic."  *Id.*  Based on these facts, the Court awards M.H.M. $5,000,000 in
solatium damages.

M.Y. is John Doe 2's father.  *Id.* at 12.  He had a "pleasant relationship" with his son,
who helped him "in all aspects of life."  *Id.*  By the time of the bombing, M.Y. had grown older
and John Doe 2 had taken up the role of breadwinner for the family.  *Id.*  M.Y. learned of the
bombing on television, then rushed to the hospital.  *Id.* at 13.  He describes it as "the hardest day
of [his] life."  *Id.* at 13.  John Doe 2's death caused M.Y. to lose "all [his] power and strength
and become a weak and poor father."  *Id.*  The loss brought headaches and severe stress upon

M.Y. *Id.*  He now feels weak, cries constantly, and often visits doctors who tell him that his stress may lead to paralysis or stroke unless it abates.  *Id.*  He also suffers from mental illness, high blood pressure, memory loss, insomnia, apathy, and very low energy levels—none of which afflicted him prior to his son's death.  *Id.*  The loss has also brought financial hardship to M.Y. He claims the family "can hardly make ends meet and cannot afford most of [their] needs."  *Id.* Based on these facts, the Court awards M.Y. $5,000,000 in solatium damages.

Na. is John Doe 2's mother.  *Id.* at 18.  They had a "wonderful and close" relationship. *Id.*  And Na. saw many of John Doe 2's dreams come to fruition, including fathering a child of his own.  *Id.*  But Na. says all this was cut short when her other sons told her of his death.  *Id.* at 19.  The news caused Na. to "los[e] all hope immediately," and left her "speechless" and numb. *Id.*  It also stirred up many medical issues for Na., such as diabetes, anxiety, physical weakness, and psychological trauma.  *Id.*  Though she desires medical attention for these ailments, she cannot afford to treat them all.  Perhaps worst of all, Na.'s "heart yearns for the days [she] would see [her] son spending time with his child," but she cannot even "look at [her] grandson" given his resemblance to John Doe 2.  *Id.*  Based on these facts, the Court awards Na. $5,000,000 in solatium damages.

A.Fd. is John Doe 2's brother.  *Id.* at 22.  He recalls his brother's love and support, especially when it came to his education.  *Id.*  Indeed, John Doe 2 paid A.Fd.'s tuition and gave him "extra money for daily expenditures."  *Id.*  This allowed him to focus on his studies.  *Id.*  But things changed for the worst when A.Fd. learned of John Doe 2's passing.  The loss made A.Fd. feel as if he had "lost one of [his] own body parts" and left him with a lingering "sense of despair."  *Id.* at 23.  Ever since, A.Fd. suffers mental breakdowns, nervousness, and nightmares whenever he thinks of his brother's death.  *Id.*  He also had to drop out of school because he

could no longer afford tuition.  *Id.*  Likewise, he cannot seek necessary medical treatments because the costs are out of reach.  *Id.*  Based on these facts, the Court awards A.Fd. $2,500,000 in solatium damages.

M.A. is John Doe 2's second brother.  *Id.* at 26.  The two "pledged to fight life's problems" together, and John Doe 2 financially supported M.A.  *Id.*  M.A. recalls learning of the explosion when one of his brother's friends gave him a call.  *Id.*  Concerned, he raced to the hospital where he "realized what had actually happened" and began "hitting and slapping [his] face and screaming very loudly."  *Id.* at 27.  He calls the loss of his brother a "dire tragedy" that made him feel as if he had "lost an arm."  *Id.*  He gets "sadder and angrier by the day" when he thinks of the senseless bombing.  *Id.*  And the grief he experiences has caused severe headaches, stomach problems, and acid reflux.  *Id.*  Based on these facts, the Court awards M.A. $2,500,000 in solatium damages.

Di. is John Doe 2's sister.  *Id.* at 30.  She had a "great bond" with her brother—one so close it felt like a "spiritual[] connect[ion]."  *Id.*  She recalls learning of her brother's death when a relative interrupted her watching television.  *Id.*  It was the "most difficult moment of [her] life."  *Id.*  It left her with "an extremely terrible feeling that was too difficult to explain with words."  *Id.* at 31.  And it caused her to experience "psychological dysfunction" such that she "cannot get along with girls [her] age or with others in society."  *Id.*  Her ability to memorize things has been dampened as well.  *Id.*  Based on these facts, the Court awards Di. $2,500,000 in solatium damages.

*c. Relatives of John Doe 3*.  John Doe 3 is survived by six relatives suing here:  his widow (Mz.), two minor children (Mb. and Be.), father and mother (M.B. and B.S.), and brother (G.B.).  *See* Damages Mem. at 27–30.[5]

Mz. is John Doe 3's widow and the mother of his two minor children, Mb. and Be.  *See* John Doe 3 Family Affs. at 1, ECF No. 32-6.  Mz. and John Doe 3 had been married for three years when he died.  At the time, their son, Mb., was two years old and their daughter, Be., was six months old.  *Id.*  Mz. characterizes the "entire three years" of her marriage with John Doe 3 as a period full of "love, attention, joy, and comfort."  *Id.*  Yet that period came crashing to a close when she learned of the bombing from relatives who appeared with her husband's coffin. *Id.* at 2.  She immediately became weak and fainted.  *Id.*  And she describes the adjustment to life without her husband as "extraordinarily strenuous."  *Id.*  Since his death, she feels like her life is "meaningless."  *Id.*  She "no longer smile[s] or laugh[s]."  *Id.*  And she suffers from depression, physical weakness, high blood pressure, and kidney pain.  *Id.*  Although she has seen doctors and therapists, she cannot get over the loss.  *Id.*  Finances have become tight for her family, their plans of moving to the United States got put on hold, and her children miss the "hugs, kisses, and love" their father gave them every day.  *Id.* at 3–4.  Based on these facts, the Court awards Mz. $8,000,000 in solatium damages, Mb. $5,000,000 in solatium damages, and Be. $5,000,000 in solatium damages.

M.B. is John Doe 3's father.  *Id.* at 9.  He describes his son as "true and loyal," always willing to provide for his parents and family.  *Id.*  M.B. felt the blast when it went off because his house was located next to Zanbaq Square.  *Id.* at 10.  Alarmed, he "immediately went outside"

---

[5] R.K. is John Doe 3's nephew and the legal representative of his estate.  *See* John Doe 3 Family Affs. at 27, ECF No. 32-6; Am. Compl. at 5 ¶ 18.  But Plaintiffs do not ask for any damages on behalf of R.K.  *See* Damages Mem. at 27–30.  So the Court awards none.

and "felt a strong pain inside [his] heart" sensing the possibility that his son had been harmed. *Id.*  Then his worst fears came true when he arrived at the hospital to find his son's body being washed and prepared for burial.  *Id.*  He remembers falling to the ground and blacking out until he "was at [his] son's grave." *Id.*  The loss devastated him and has impaired his health.  *Id.* Before his son's death, M.B. was healthy.  Now he suffers from anxiety, high blood pressure, a brain disorder, and loneliness.  *Id.*  Doctors blame these ailments on the bombing and stress brought on by his son's death.  *Id.* at 11.  Because John Doe 3 supported him and the rest of the family, M.B. also worries what will happen when they "completely run out of money." *Id.* Based on these facts, the Court awards M.B. $5,000,000 in solatium damages.

John Doe 3's death had a similar effect on his mother, B.S.  *Id.* at 15.  B.S. had a loving relationship with her son, and he used to call her daily to check in on her.  *Id.*  Like her husband, B.S. felt the shockwave when the bomb went off.  *Id.* at 16.  Then she remembers going to a relative's house where she "just stared at [her] son's body." *Id.*  She recalls being so shocked that she could not even cry.  *Id.*  She just "lost all of [her] emotions and senses for the first few days." *Id.*  Then the physical illnesses and psychological trauma set in, paralyzing her right hand, disrupting her memory, and causing her eyelids to malfunction due to "excessive crying and anxiety." *Id.*  Although she wants treatment for these ailments, she finds it difficult to afford proper care.  *Id.* at 17.  Based on these facts, the Court awards B.S. $5,000,000 in solatium damages.

G.B. is John Doe 3's brother.  *Id.* at 21.  They had a "strong relationship" and "great respect" for each other.  *Id.*  He recalls working at the U.S. Embassy when the bomb went off, causing him to immediately worry about his brother's safety.  *Id.* at 22.  Then he raced to the hospital where he found his brother's body lying next to several other deceased individuals.  *Id.*

He could not believe it.  He "held his hands tightly, yelling at him to wake up."  *Id.*  But that never happened.  The loss has been difficult for G.B. to comprehend.  Every time he thinks of his brother, his eyes swell with tears.  *Id.*  Now he also suffers from anxiousness, memory loss, and depression—afflictions he never experienced before the bombing.  *Id.*  Doctors have told him that his health problems "undoubtedly" stem from his brother's death.  *Id.* at 23.  Since then, G.B. has taken responsibility for his brother's wife and children, and spends all his income on their basic needs.  *Id.*  Based on these facts, the Court awards G.B. $2,500,000 in solatium damages.

> *d. Relatives of John Doe 4.*  John Doe 4 is survived by nine relatives suing here:  his widow (Za.), two minor children (Ne. and Du.), mother (A.G.), four brothers (Se., Qu., Sh., and Sa.), and sister (Ns.).  *See* Damages Mem. at 30–35.

> Za. is John Doe 4's widow and the legal representative of his estate.  *See* John Doe 4 Family Affs. at 1, ECF No. 32-7.  She is also the mother of their minor daughters, Du. and Ne. *Id.*  Before John Doe 4 died, they shared in a life "full of joy, happiness, and love."  *Id.* at 2.  His presence made Za.'s life worry-free, and he provided for all their needs.  *Id.*  That all changed when Za. heard about the explosion on television.  *Id.*  She tried to contact John Doe 4 by telephone, but he never answered.  *Id.*  Then one of his brothers called and delivered the bad news.  *Id.*  She could hardly believe it.  She became weak and dizzy, yet unable to cry.  *Id.* Every area of her life has been impaired.  Financially, her family feels strapped.  *Id.*  Physically, she suffers from severe headaches and a general sense of weakness.  *Id.*  Psychologically, she endures anxiety and an inability to control her emotions.  *Id.*  And relationally, she had to marry her brother-in-law to ensure continuity of care, though it was an arrangement she never desired. *Id.* at 3.  Based on these facts, the Court awards Za. $8,000,000 in solatium damages.

Za.'s minor daughters, Du. and Ne., also mourn the loss of their father. *Id.* at 4.  Ne. was an infant when John Doe 4 died. *Id.*  The trauma was so severe for Za. that it made her unable to "breastfeed for a long time," depriving Ne. of her primary source of nourishment. *Id.* at 3.  Her mother grieves the fact that Ne. "lost the warm embrace of her father" at such an innocent age. *Id.* at 4.  Much the same for Ne.'s older sister Du., who was only three years old when the attack happened. *Id.*  Du. registered the loss immediately.  Her "screams and cries were heard throughout [the] neighborhood." *Id.*  And she cries every day she thinks about her father. *Id.*  This angers Za., who has to watch Du. endure "pain and sorrow" in "what should be the most carefree season of her life." *Id.*  Based on these facts, the Court awards Du. and Ne. $5,000,000 each in solatium damages.

A.G. is John Doe 4's mother. *Id.* at 11.  They had a relationship deeper than words could describe. *Id.*  A.G. wrote:  "I not only lost my son, but also my life when he died.  No one can take his place in my heart." *Id.*  When she learned of is passing, she "felt as if the sky had fallen," and "could not breathe." *Id.* at 12.  Physically and psychologically, her life has not been the same.  Her body is weak and her hands tremble. *Id.*  She also desires seclusion, and suffers from anxiety, panic disorder, uterine disorder, and high blood pressure. *Id.*  Her life's biggest desire—"to go to the Hajj (Islamic pilgrimage) with him"—is now impossible to fulfill. *Id.* at 13.  Based on these facts, the Court awards A.G. $5,000,000 in solatium damages.

John Doe 4's death also rocked his four brothers:  Se., Qu., Sh., and Sa. *Id.* at 17, 23, 29, and 34.  For instance, they viewed their brother as a "friend, teacher, and mentor." *Id.* at 17.  And they recount stories of his emotional support and financial assistance. *See, e.g.*, *id.* at 29 (giving Sh. money to "support [his] family"); *id.* at 34 (Sa. describing their "unique bond" due to their closeness in age).  They all remember the moment they learned of John Doe 4's death.  Se.

fainted and hit his factory's floor. *Id.* at 18. Qu. "lost [his] cool" and recalls the heartache he felt when he saw his dead brother. *Id.* at 24. Sh. became "fiercely sad and unintentionally broke some of the hospital's glasses." *Id.* at 30. And Sa. "could not feel [his] feet on the ground," "fell several times," and thought he was "burning in hell." *Id.* at 35. The bombing changed their lives for the worse. Se. suffers from "excessive anxiety," which forced him to drop out of university. *Id.* at 18. He also married Za. out of a "sense of responsibility," although he did not "wish to marry her." *Id.* at 19. Qu. has been afflicted by anxiety, depression, and hemorrhoids. *Id.* at 24. Sh. feels a tendency to self-harm, lost some of his hearing, and no longer "get[s] along with people in society." *Id.* at 30. And Sa. similarly cut his hands, has a heart disease, and had to quit his studies due to the lack of financial support. *Id.* at 35. Based on these facts, the Court awards each of the brothers $2,500,000 in solatium damages.

So too with John Doe 4's sister, Ns. *Id.* at 40. Her brother "loved and respected" her and cared for her given her husband's disability. *Id.* When she learned of his passing, she "lost every sense of feeling in [her] body." *Id.* at 41. She describes it as having "a body without a soul." *Id.* And she says the loss has taken a physical toll on her body. She now looks "ten or fifteen years older than [her] real age," gets homesick, and endures severe headaches whenever she thinks about John Doe 4. The headaches have gotten so bad that she was forced to quit her profession as a tailor. *Id.* at 41–42. Based on these facts, the Court awards Ns. $2,500,000 in solatium damages.

*e. Relatives of John Doe 5.* John Doe 5 is survived by four relatives suing here: his widow (So.), two minor children (Nm. and Pa.), and brother (Es.). *See* Damages Mem. at 35–37.

So. is John Doe 5's widow, mother of their two minor children, and the legal representative of his estate. *See* John Doe 5 Family Affs. at 1, ECF No. 32-8. She remembers

her husband as "a wonderful man" who cared for her in a "lovely and warm relationship." *Id.* at 2. They were married for seventeen years when he died. *Id.* The moment she learned of his passing, it marked the beginning of a "dark and sorrowful life" for her and her family. *Id.* At first, she could not tolerate the news and "fainted many times." *Id.* All she could feel was "pain, sorrow, tears, and [a] lack of hope." *Id.* at 3. Now she endures high anxiety and has even harmed herself at times. *Id.* Her head feels like it is "about to explode," yet she cannot afford medical treatment. *Id.* The financial difficulties also stamped out the dream she shared with John Doe 5 to "buy a house of [their] own." *Id.* at 4. Unless things get better, she foresees "a very dark future for [her] children." *Id.* Based on these facts, the Court awards So. $8,000,000 in solatium damages.

Nm. and Pa. also feel the negative effects of their father's absence. *Id.* at 5–6. Nm. was very young when John Doe 5 died, and it marked the first time he learned what death was—a heartbreaking experience for So. to watch. *Id.* at 5. Without his father's "love, hugs, and strong support," Nm. lives an anxious life and lacks the ability to take English and computer classes. *Id.* Pa. has faced similar roadblocks since her father's passing. For instance, she wants to become a tailor, but her family can no longer afford a sewing machine. *Id.* at 6. And her emotional state has suffered, too. She keeps a picture of her father nearby and always cries when she looks at it. The loss left her depressed, and her mother calls her condition "very worrying." *Id.* Based on these facts, the Court awards each of the children $5,000,000 in solatium damages.

That leaves Es., John Doe 5's brother. *Id.* at 15. John Doe 5 was a father figure to Es. given their own father had passed when the attack occurred. *Id.* But "everything changed in the worst way possible" for Es. when his brother died. *Id.* He recalls learning of the attack when he heard "a death announcement" over a loudspeaker. *Id.* He started to tremble, then "lost control

over [his] body" and "could not think straight." *Id.* at 16.  Es. developed an ongoing heart problem, but he cannot treat it due to the tight financial situation his brother's passing brought on the family.  *Id.*  He had also planned to build a home with his brother using their accumulated life savings.  *Id.*  That dream, however, has been dashed because all his earnings now go to basic needs.  *Id.*  Based on these facts, the Court awards Es. $2,500,000.

*f. Relatives of John Doe 6.*  John Doe 6 is survived by 10 relatives suing here:  his widow (G.G.), seven children (Mt., Om., Sk., Ta., Sm., Ra., and Fa.), mother (B.B.), and two sisters (B.Z. and Hk.).  *See* Damages Mem. at 37–43.

G.G. is the widow of John Doe 7 and the legal representative of his estate.  *See* John Doe 6 Family Affs. at 1, ECF No. 32-9.  She describes John Doe 6 as a dedicated provider that "prioritized taking care of his wife and children."  *Id.* at 2.  G.G. was home when she heard the explosion, but did not realize that her husband died until his coffin was brought to the house the next day.  *Id.*  She passed out, and when she woke "[t]he entire world became hell."  *Id.*  The death made her "feel entirely alone and incomplete."  *Id.*  She also now suffers from body pain, asthma, headaches, and high blood pressure—all in addition to anxiety, self-harm, and uncontrollable trembling.  *Id.*  Though G.G. would like treatment for her afflictions, she cannot afford it due to the loss of her husband's income.  *Id.*  As the mother to their children, she attests that "[e]very single person in the family has been negatively affected by the torment of [her] husband's death and needs regular attention and medical care."  *Id.* at 3.  Based on these facts, the Court awards G.G. $8,000,000 in solatium damages.

John Doe 6's death wrecked his two young sons, Mt. and Om.  *Id.* at 3–4.  Before the attack, Mt. was "a sociable and clever boy" who excelled in school and lived according to a fixed schedule.  *Id.* at 3.  Now he has "cognitive issues and can barely understand or learn his lessons."

*Id.*  G.G. knows he needs therapy and medical help but laments she cannot afford it.  *Id.* at 4.  So too with their other son Om., who was the youngest member of the family.  *Id.*  He learned of his father's death when he returned from school.  *Id.*  Upon hearing the news "he started hitting himself, fell to the ground, and called out 'father' to the coffin repeatedly."  *Id.*  His mental condition ever since has been "awful."  *Id.*  He cannot sleep at night and grinds his teeth.  *Id.*  He also had to switch from private to public school due to the loss of his father's income, which has "made him less successful academically."  *Id.* at 5.  Based on these facts, the Court awards Mt. and Om. $5,000,000 apiece in solatium damages.

Sk. is John Doe 6's grown daughter.  *Id.* at 11.  She lived near her father, which allowed him to drop by every day after work.  *Id.*  He even gave her money from his paycheck though she never asked for it.  *Id.*  When her brother told her of the bombing, her "mind exploded" and she fell to the ground.  *Id.*  His passing has robbed her of "peace and comfort" in her life and left her with many physical and psychological issues.  *Id.*  For instance, she can no longer concentrate or focus and gets fevers constantly.  *Id.*  She has also lost three babies at birth—tragedies her doctors attribute to the anxiety associated with her father's gruesome death.  *Id.*  Based on these facts, the Court awards Sk. $5,000,000 in solatium damages.

Ta. is John Doe 6's first grown son.  *Id.* at 17.  John Doe 6 was Ta.'s "role model in life."  *Id.*  Indeed, Ta. "wanted to follow his footsteps throughout [his] life because he possessed all the necessary characteristics of a good man and father."  *Id.*  Ta. notes that his father constantly "struggled and sacrificed" to give his family a better life.  *Id.*  When the bomb went off, he immediately became concerned.  *Id.* at 18.  The next day, his worst fears were confirmed when officials "brought a piece of his body to [their] house."  *Id.*  His grief was "all-encompassing," and led to many "mental and psychological problems."  *Id.*  It also caused him to drop out of

school because he "needed to work hard and work long hours to provide food and shelter for [his] family." *Id.* Based on these facts, the Court awards Ta. $5,000,000 in solatium damages.

Sm. is John Doe 6's second grown son. *Id.* at 23. He had "an incredibly strong bond with [his] father," characterized by his father's kindness, support, and companionship. *Id.* Sm. worked near Kabul Square, so he raced to the scene when he heard the blast. *Id.* Police then directed him to the local hospital where he walked in on the "horrifying sight" of victims without heads, hands, or feet. *Id.* Though he could not find his father at the hospital, officials later delivered a coffin containing "parts of [his] body." *Id.* at 25. This made Ha. feel "like the pillar of [his] family had crumbled." *Id.* He dreamed of the "haunting experience" he had in the hospital searching for this father. *Id.* And he stopped his education to start providing for his family. *Id.* He also regrets the fact that his father died without witnessing his wedding. *Id.* Based on these facts, the Court awards Sm. $5,000,000 in solatium damages.

Ra. is John Doe 6's third grown son. *Id.* at 30. He was a teenager at the time of the attack, and never imagined that he would lose his father. *Id.* John Doe 6 helped Ra. remain "mentally calm and physically strong" whenever he faced challenges in his life. *Id.* But the bombing brought all this to an end. Ra. isolated himself and developed a cognitive disorder. *Id.* at 31. For example, Ra. has violent outbursts for no reason, breaking windows and trying to harm others. *Id.* Although antipsychotic medication temporarily patches these problems, he has yet to find a permanent fix. *Id.* Due to his mental issues, he has been unable to pursue education or land a stable job. *Id.* Based on these facts, the Court awards Ra. $5,000,000 in solatium damages.

Fa. is John Doe 6's minor daughter. *Id.* at 35. Fa. admired her father for "always [doing] the right thing," and misses his "warm embrace." *Id.* She notes that he gave all his children "the

same love and support"; he "did not discriminate between his sons and daughters." *Id.* She recalls learning of his death when she returned to school only to find her family members "screaming and crying intensely." *Id.* at 35. She became "completely depressed," lost her appetite, and was stunned that she had lost her "strong shelter." *Id.* Though she had dreamt of becoming a lawyer, she lost interest in school after her father's death. Now she thinks her "ambitions will never come true." *Id.* Based on these facts, the Court awards Fa. $5,000,000 in solatium damages.

B.B. is John Doe 6's mother. *Id.* at 41. B.B. had a "strong and beautiful relationship" with her son that made her "feel secure and confident in life." *Id.* But she became "emotionally dead" when she learned of his death. *Id.* It has been "very difficult" to accept his passing and she has learned that crying cannot lessen "the strong and everlasting grief and sorrow in [her] heart." *Id.* at 42. Every day of her life she struggles with grief, anxiety, and depression. *Id.* This has made her a "sad and isolated person in the community." *Id.* Based on these facts, the Court awards B.B. $5,000,000 in solatium damages.

B.Z. is John Doe 6's first sister. *Id.* at 45. B.Z. describes her brother as caring and peaceful, filling her life with "love, compassion, and kindness." *Id.* Learning of his death broke her heart and left her with "everlasting grief and pain." *Id.* at 46. It also plunged her mind into "psychological chaos," leaving her unable to "build good relationships with [her] family or friends." *Id.* Based on these facts, the Court awards B.Z. $2,500,000 in solatium damages.

Hk. is John Doe 6's second sister. *Id.* at 49. Hk. relied on John Doe 6 to "feel secure in society," and he assisted her financially. *Id.* Realizing he had died was an awful experience. It caused her to lose all hope "and start[] cursing holy things." *Id.* at 50. Hk. says her brother's death is "the most painful and unforgettable experience" in her life. *Id.* Before his passing, she

was a "friendly and sociable girl." *Id.* Now she suffers from "hopelessness, a short temper, and anxiety." *Id.* She often thinks her life is meaningless, and she fears death and the idea of losing more of her loved ones. *Id.* "Neither medication nor meditation have helped," and additional treatment lies beyond her family's financial capabilities. *Id.* at 51. She is unsure how long she can continue to suffer. *Id.* Based on these facts, the Court awards Hk. $2,500,000 in solatium damages.

     *g. Relatives of John Doe 7.* John Doe 7 is survived by four relatives suing here: his widow (N.E.) and three children (E.E., S.E., and Sa.E.). *See* Damages Mem. at 43–46.

     N.E. is John Doe 7's widow and the legal representative of his estate. *See* John Doe 7 Family Affs. at 1, ECF No. 32-10. N.E. states her marriage provided her emotional support and companionship, as well as encouragement and various forms of assistance. *Id.* at 2. N.E. sums up their relationship by calling John Doe 7 a "dear friend, companion, and wonderful partner." *Id.* at 3. She recalls sitting at the breakfast table with their children when they heard the explosion. *Id.* She immediately dialed John Doe 7 on his cell phone, but he never answered. *Id.* Though she scoured the scene of the blast and visited the local hospital, she had trouble finding John Doe 7. *Id.* at 4. This caused her to fear the worst—fears soon confirmed by family members. *Id.* Upon hearing the news, N.E. "screamed and felt as if the sky . . . had shattered." *Id.* She remembers that day as the "darkest moment of [her] life." *Id.* John Doe 7 died in the midst of applying for visas to relocate to the United States. *Id.* Though those visas were granted, N.E. found relocation unexpectedly burdensome given her inability to speak English and limited knowledge of life here. *Id.* She often thinks how much easier it would have been with her husband. *Id.* Based on these facts, the Court awards N.E. $8,000,000 in solatium damages.

E.E. is John Doe 7's son.  *Id.* at 5.  He was very young at the time of the attack but still missed the "considerable amount of time and attention" his father gave him when he was alive. *Id.* at 6.  According to N.E., E.E. says he "misses his father on a daily basis."  *Id.*  This frustrates his ability to concentrate on his studies.  Based on these facts, the Court awards E.E. $5,000,000 in solatium damages.

S.E. is John Doe 7's first adult daughter.  *Id.* at 12.  S.E. had an "extremely strong" bond with her father when he was alive.  *Id.*  They "were more than just father and daughter."  *Id.* They were "best friends."  *Id.*  She recalls washing her face when the bomb detonated.  *Id.* Though she went to school that day, a relative picked her up and told her she needed to return home.  *Id.* at 13.  When she arrived, she saw the anguish in her family members' faces.  *Id.*  The news shattered her heart.  Her father's death left her in a state of "profound depression" and with "severe psychological difficulties."  *Id.*  Moving to America made the pain worse.  She was "completely unfamiliar with the English language" and felt hopeless "[s]eeing other children happily accompanied by their fathers."  *Id.* at 14.  Though her emotional wellbeing has improved through counseling, her grief still haunts her.  *Id.*  For instance, she still feels irritable and sensitive, and has trouble sleeping at night.  *Id.* at 14–15.  She also has to work long hours while attending college classes to support her family.  *Id.* at 15.  Based on these facts, the Court awards S.E. $5,000,000 in solatium damages.

Sa.E. is John Doe 7's second adult daughter.  *Id.* at 19.  Sa.E.'s relationship with John Doe 7 "ran incredibly deep."  *Id.*  They were "like the closest of friends," and he "consistently played a pivotal role in [her] life, serving as a mentor and steadfast supporter."  *Id.*  She recalls seeing an urgent news alert on the television the morning of the bombing.  *Id.* at 2.  Then she noticed it occurred near her father's workplace.  *Id.*  Family members told her what happened,

and her heart sank.  *Id.*  She became completely shocked and broke down into tears.  *Id.*  Sa.E. says her father's death "remains the most traumatic event of [her] life."  *Id.*  Though her family has started over in the United States, her father's absence persists as a "source of sorrow."  *Id.* at 21.  Based on these facts, the Court awards Sa.E. $5,000,000 in solatium damages.

*h. Relatives of John Doe 8*.  John Doe 8 is survived by six relatives suing here:  his father and mother (M.Q.G. and F.G.) and four siblings (M.O.G., B.G., M.G., and T.G.).  *See* Damages Mem. at 46–48.

M.Q.G. is John Doe 8's father and the legal representative of his estate.  *See* John Doe 8 Family Affs. at 1, ECF No. 32-11.  M.Q.G. describes John Doe 8 as "the most responsible one of all [his] children," noting he was "already ready to step in" and do what was needed.  *Id.* at 2.  Officials told M.Q.G. that his son's "stomach burst due to the intense pressure of the explosion."  *Id.*  This traumatized M.Q.G., causing him to always feel worried, sad, and impatient.  *Id.*  John Doe 8 was engaged when he died, and M.Q.G. regrets never being able to see him get married.  *Id.* at 3.  M.Q.G. has received some treatment for his psychological problems, yet cannot afford all the treatment he needs.  *Id.*  Based on these facts, the Court awards M.Q.G. $5,000,000 in solatium damages.

F.G. is John Doe 8's mother.  *Id.* at 7.  Like M.Q.G., F.G. describes her son as "extremely responsible and caring," always willing to work and study diligently to help his family.  *Id.*  News of John Doe 8's death made F.G.'s whole world collapse.  *Id.*  She heard the explosion and immediately feared for her son's life.  *Id.* at 8.  A family member later identified his body and informed F.G. that the explosion caused "his stomach and heart to burst, resulting in instant death."  *Id.* at 8.  This caused her to become overwhelmed with grief.  Since the loss, F.G. has struggled with insomnia, fatigue, anxiety, and high blood pressure.  *Id.*  The psychologists she

has seen attribute her problems to her son's traumatic death.  *Id.*  Before the attack, she had been studying at a religious school.  *Id.*  Yet she has since stopped attending because she lacks the energy and concentration to keep going.  *Id.*  She, like her husband, also regrets being unable to see John Doe 8 get married.  *Id.* at 9.

F.G. also notes that her youngest son, M.O.G., was around two years old when his older brother died.  *Id.*  She remembers the love John Doe 8 had for M.O.G. and recalls times he would bring gifts home for his younger brother.  *Id.*  Since John Doe 8 died, M.O.G. refers to his grave as "his brother's house."  Based on these facts, the Court awards F.G. $5,000,000 and M.O.G. $2,500,000 in solatium damages.

John Doe 8's death profoundly impacted his other three siblings:  B.G., M.G., and T.G. B.G. recalls his brother's kind heart and support for everyone in the family.  *Id.* at 13.  M.G. says her relationship with John Doe 8 was "truly special," and especially misses "waiting for him to come home so [they] could watch [their] favorite movie."  *Id.* at 17.  T.G., too, had a "wonderful relationship" with John Doe 8, saying he was always "a responsible and supportive member of [their] family."  *Id.* at 25.  B.G. was around 13 years old when John Doe 8 died.  *Id.* at 14.  The bombing made him fear death, isolate himself from others, and perform poorly in school.  *Id.* M.G. was in tenth grade when she heard the explosion.  *Id.* at 18.  She shook and fell to the ground when she learned her brother had died.  *Id.*  And she recalls seeing his burned face in the casket, something no sibling should ever have to see.  *Id.*  Since his passing, her performance in school plunged (she used to be the top student in her class).  *Id.* at 19.  And she has become "extremely emotional and easily agitated."  *Id.* at 18.  John Doe 8's death similarly haunts T.G.'s "mind and soul."  *Id.* at 26.  He says that day "is etched as the worst and saddest day of [his]

life." *Id.*  Based on these facts, the Court awards B.G., M.G., and T.G. $2,500,000 apiece in solatium damages.

*     *     *

In closing, the Court notes that no damage award or amount of money can erase the nightmare these Relatives endured.  The Zanbaq Square attack took their fathers, brothers, sons, and husbands.  That said, the Court's monetary awards "must be grounded in the law, not sympathy or instinct." *Borochov*, 589 F. Supp. 3d at 48.

## V.  CONCLUSION

For these reasons, the Court will partially grant Plaintiffs' Motion for Default Judgment and award them damages.[6]  A corresponding Order will issue today.


Dated: December 22, 2023                          _____

                                                  TREVOR N. McFADDEN, U.S.D.J.

---

[6] Plaintiffs hint at a request for prejudgment interest.  They requested it outright in their Complaint.  *See* Am. Compl. at 35–40.  But they never mentioned it again. *See* Damages Mem. at 51–55.  If Plaintiffs still seek prejudgment interest, the Court denies that request.  While the Court has discretion to award prejudgment interest, the "tide of persuasive precedent . . . plainly weighs against" it. *Selig*, 573 F. Supp. 3d at 77 (cleaned up).  More, "[t]he Court has carefully considered" each Plaintiff's entitlement to damages, and their "awards are intended to be fully compensatory." *Id.* at 78.  This makes prejudgment interest unwarranted.